PEOPLE v DAOUD

Docket No. 113994. Argued March 9, 2000 (Calendar No. 7). Decided July 20, 2000.

Mahir G. Daoud flagged down a Detroit police vehicle and told officers that he had killed his mother. The officers thereafter advised him of his rights under *Miranda v Arizona*, 384 US 436 (1966). The defendant was again advised of his *Miranda* rights at the police station, after which he made a tape-recorded confession. In all, before his preliminary examination he was advised of his rights three times. The Oakland Circuit Court, Barry L. Howard, J., ordered that the defendant be examined by the Center for Forensic Psychiatry, and, after hearing testimony from three experts, suppressed the defendant's statements on the ground that he did not make a knowing and intelligent waiver of his *Miranda* rights. The Court of Appeals, FITZGERALD, P.J., and CAVANAGH and WHITBECK, JJ., reversed in part in an unpublished order, explaining that the defendant's initial statements were not the product of custodial interrogation and thus were outside the scope of *Miranda*. However, it left standing the trial court's decision suppressing the defendant's recorded confession (Docket No. 215615). The people appeal.

In an opinion by Justice YOUNG, joined by Chief Justice WEAVER, and Justices TAYLOR, CORRIGAN, and MARKMAN, the Supreme Court *held*:

The trial court applied an erroneous legal standard in assessing the validity of defendant's *Miranda* waiver. The waiver was valid.

1. Whether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion. The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. In this case, there is no question that the defendant's decision to waive his *Miranda* rights and his decision to confess were completely voluntary.

2. Determining whether a suspect's waiver was knowing and intelligent requires an inquiry into the suspect's level of understanding, irrespective of police behavior. To knowingly waive *Miranda* rights, a suspect need not understand the ramifications and conse-

quences of choosing to waive or exercise the rights that the police have properly explained. The constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of *Miranda* rights. Lack of foresight is insufficient to render an otherwise proper waiver invalid.

3. The trial court erred as a matter of law because it misread *People v Cheatham*, 453 Mich 1 (1996), and, consequently, focused on why the defendant was confessing rather than considering whether the defendant could in fact understand and waive his *Miranda* rights. Viewing the objective circumstances surrounding the waiver, it clearly was knowing and intelligent.

Reversed.

Justice CAVANAGH, joined by Justice KELLY, dissenting, stated that the trial court did not clearly err in its determinations that the defendant was delusional at the time he confessed and that he was unable to understand the actual consequences that could arise as a result of his confession. The legal conclusions drawn by the trial court should be affirmed because the prosecution did not bear its burden of proving that the defendant knowingly and intelligently waived his constitutionally protected rights under the totality of the circumstances.

The majority opinion is incomplete to the extent that it fails to fully explore the burden of proof that must be borne by the prosecution, and fails to distinguish the factual issues from the legal issues in this case. Although the majority announces that the prosecution has the burden of establishing a valid waiver by a preponderance of the evidence, traditionally, constitutional waiver cases place a heavy burden on the prosecution. To date, the United States Supreme Court has never expressly declared that a preponderance standard should be applied in knowing and intelligent waiver cases. Although imposition of the preponderance standard in *Colorado v Connelly*, 479 US 157 (1986), arguably extends to knowing and intelligent waiver cases, the proposition is certainly open to debate. In announcing the preponderance standard in *Connelly*, the Supreme Court examined cases involving the exclusion of evidence, and built upon other cases examining voluntary waiver, and its recent recognition that *Miranda* was a constitutional decision, lends some support to the proposition that *Connelly*'s rationale should not be extended to knowing and intelligent cases.

Although the majority recognizes that the trial court's findings of fact must be reviewed for clear error, nowhere does it apply the standard it announces, instead proceeding with an open-ended analysis after concluding that the meaning of "knowing and intelli-

gent" is a question of law. Given the broad range of issues that may be considered factual, it should not be summarily concluded that all questions remotely related to the knowing and intelligent inquiry are legal in nature. The trial judge weighed the credibility of the competing witnesses and found that, at the time of his arrest, the defendant was psychotic, and that the nature and subject matter of his delusions prevented rational comprehension of his right to counsel and his right against self-incrimination. Nothing in the record suggests that the trial judge's factual findings were clearly erroneous. Thus, the key legal question is whether the defendant could knowingly and intelligently waive his rights despite his delusions.

Examination of *Miranda*-based knowing and intelligent waiver cases must proceed with a consideration of the totality of the circumstances. Mental illness fits naturally within the totality of the circumstances test, and it may be a factor tending to indicate that a defendant cannot understand the rights he is waiving or what the consequences of that waiver might be. In this case, the prosecution has proceeded under a flawed legal interpretation of *Miranda* in arguing that mental illness should not be factored into the totality of the circumstances equation. Thus, its case must fail, even by a preponderance of the evidence.

The authority the majority offers in support of its knowing and intelligent waiver analysis leaves open the possibility that a defendant's level of comprehension about the consequences of waiver will be relevant. None of the authority holds that a waiver will be valid per se if the defendant is able to literally comprehend *Miranda*, but is unable to apply that literal meaning to his own situation. A conclusion that a defendant need not understand every consequence of confessing is different than a conclusion that the defendant must understand the most basic consequences of confessing. In this case, the defendant misunderstood the consequences of speaking freely to the police. He lacked a basic comprehension of what could actually occur if he waived his rights, and the trial court's analysis comports with United States Supreme Court observations that a defendant must possess at least a basic understanding of his rights under the totality of the circumstances. The defendant's decision to confess was directly tied to his delusion that God would control the police and set him free. It is therefore questionable whether the defendant ever truly comprehended the actual meaning of the *Miranda* warnings.

The ultimate focus for purposes of the knowing and intelligent prong of *Miranda* remains on the level of the suspect's comprehension. The validity of a waiver does not depend on a verbatim recita-

tion of the *Miranda* litany, but rather on an actual understanding of the individual of his *Miranda* rights and the consequences of waiving them. While a defendant cannot successfully challenge a waiver as invalid on the basis that a decision to waive *Miranda* rights was imprudent, wisdom is not relevant to this defendant's confession. The defendant's waiver defense springs not from a lack of wisdom, but from an inability to fully understand that the dictionary meaning of the *Miranda* warning would actually apply to his circumstances. The trial court held that his delusions about the consequences of his actions brought about his confession. No amount of information or wisdom would have altered the delusion compelling the defendant to confess. Mental illness and shrewdness are not equivalent concepts.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Anica Letica*, Assistant Prosecuting Attorney, for the people.

*Robyn B. Frankel* for the defendant-appellee.

Amicus Curiae:

*Brian Mackie*, President, *John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*, Chief, Research, Training and Appeals, for Prosecuting Attorneys Association of Michigan.

YOUNG, J. We consider in this case the trial court's decision to suppress defendant's voluntary confession on the ground that defendant did not "knowingly and intelligently" waive his *Miranda*[1] rights. We conclude

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). The now-familiar *Miranda* warnings require the police, before a custodial interrogation, to inform a suspect (1) that he has the right to remain silent, (2) that anything he says can and will be used against him in court, (3) that he has a right to the presence of an attorney during any questioning, and (4) that if he cannot afford an attorney one will be appointed for him. *Id.* at 469-473.

that the trial court applied an erroneous legal standard in assessing the validity of defendant's *Miranda* waiver. Moreover, we conclude that the waiver was valid. Therefore, we reverse the trial court's decision suppressing defendant's confession.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 21, 1994, defendant flagged down Detroit Police Officers Nevin Hughes and Linda Dickinson, who were on routine patrol in a marked vehicle, and blurted out that he had just confessed to a 911 operator that he had killed his mother, Teriza Daoud. As it turns out, in 1985, the victim's body had been discovered in a Dumpster in Toledo, Ohio. The victim's body was "hog-tied" with electrical cord and burned. An autopsy report indicated that the victim died as a result of multiple blunt-force injuries to her head. The victim had also been exposed to some source of carbon monoxide before her death. Ironically, the case had remained unresolved until defendant's decision to approach the police nine years later.

In response to defendant's roadside outburst, Officers Hughes and Dickinson pulled their patrol car to the curb, approached defendant and advised him of his *Miranda* rights. Officer Dickinson testified at defendant's preliminary examination that defendant proceeded to waive his *Miranda* rights and tell the officers that he "took a lug wrench and he cut it in half and he hit his mother several times in the head and then he choked her and then he wrapped her up in a blanket, tied her up with some wire and he took her out to a[n] area near a school in Troy."

The officers drove defendant to the Detroit Police Department's 9th Precinct station where defendant was advised of his *Miranda* rights a second time. Defendant again waived those rights and repeated what he had previously told the officers.

In response to defendant's statement that the murder took place in Troy, Officer Dickinson immediately notified the Troy Police Department. Troy Police Detective Mitch Lenczewski testified at the preliminary examination that he and Sergeant Mark Tuck[2] went down to the Detroit Police Department on May 21 and interviewed defendant.[3] Defendant was advised of and waived his *Miranda* rights a third time. Defendant then gave a taped confession in which he explained that he repeatedly struck his mother in the head and choked her to get her to stop screaming. After killing her, defendant wrapped his mother's body in blankets and placed it in the trunk of his uncle's car. He then drove the car to a nearby school, and parked it there. Defendant returned to his mother's house, took her car, and drove it to the Oakland Mall in Troy to make it look like she had been shopping there.

After getting a ride from some "guys" at the mall, defendant returned to the school where he had left his uncle's car. Defendant bought a gasoline container, filled it, and drove to Toledo with the victim's body in the trunk. There, defendant threw his mother's body into a Dumpster and set it afire.

---

[2] Sergeant Tuck was involved in the earlier investigation of Teriza Daoud's murder.

[3] The interview was conducted by Detective Lenczewski because defendant remembered Sergeant Tuck from the original investigation and refused to talk to him.

Defendant then returned to Michigan and, with apparent success, went about concealing his crime. Following the interview with Detective Lenczewski, defendant signed a waiver form and provided a written statement in which he again confessed to his mother's murder. All defendant's statements were admitted at the preliminary examination.

After defendant was bound over for trial on June 10, 1994, he filed a notice of intent to raise an insanity defense. Accordingly, the trial court ordered that defendant be examined by the Center for Forensic Psychiatry. Following a September 1994 competency hearing, the trial court determined that defendant was incompetent to stand trial and committed him to the Michigan Department of Mental Health for treatment.[4] Upon defendant's request, the trial court further ordered that defendant be examined "relating to the issue of competency to understand his constitutional and *Miranda* rights prior to making a statement to the police . . . ."

Defendant was eventually examined by three experts, Drs. Robert Mogy, Charles Clark, and Thomas Grisso, all of whom submitted reports. *Walker*[5] hearings were held on September 25, 1996, and February 7, 1997, during which the trial court

---

[4] This decision was based on a report prepared by Dr. Jennifer Balay, an examiner for the Center for Forensic Psychiatry. That report indicated that defendant appeared delusional and that while defendant "had a superficial understanding of the fact that he had been arrested and charged with the murder of his mother," he was "completely unconcerned . . . believing that he would soon be released from jail because it was the Lord's will to do so." The report concluded that "defendant's disturbed mental state has rendered him unable to appreciate the nature and object of the proceedings against him and unable to rationally assist counsel in his own defense."

[5] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

heard testimony from all three doctors pertaining to the validity of defendant's confession. The doctors disagreed with respect to defendant's ability to understand his *Miranda* rights. Dr. Mogy believed that defendant was delusional in that he believed that God controlled the police and would set him free if he confessed and that this delusion made him unable to appreciate the fact that the police would use his statements against him. In contrast, Dr. Clark testified that there were no clear indications that defendant's confession was the product of any delusion or that defendant did not understand that the police would use his statement against him.

In light of the contradictory opinions rendered by Drs. Mogy and Clark, Dr. Grisso was hired to perform yet another examination. Dr. Grisso testified that defendant literally understood that the police intended to put him in jail; however, due to his religious "delusions and preoccupations," defendant was unable to use that information and "relate it to his own situation."

Relying on the testimony given by Drs. Mogy and Grisso, the trial court suppressed defendant's statements on the ground that defendant did not make a knowing and intelligent waiver of his *Miranda* rights. The trial court found that defendant was delusional at the time of his contact with police, in that he "believed that he had no need of any protective rights as God would be releasing him from jail as a reward for confessing to his mother's murder." The court reasoned that this delusion "prevented rational comprehension of the specific topic at issue—his right to counsel and his right against self-incrimination."

The prosecution sought leave to appeal from the Court of Appeals. That Court reversed the trial court's decision to the extent that it purported to suppress all defendant's statements.[6] The Court explained that defendant's initial statements made *before* he was transported to the police station were not the product of custodial interrogation and thus were outside the scope of *Miranda*. However, the Court left standing the trial court's decision suppressing defendant's later recorded confession.

This Court granted the prosecution's application for leave to appeal. 461 Mich 873 (1999).

## II. STANDARD OF REVIEW

In *People v Cheatham*, 453 Mich 1, 30; 551 NW2d 355 (1996), this Court set forth the standards for our review of the trial court's decision in this case:

> Although engaging in de novo review of the entire record, see *People v Walker (On Rehearing)*, 374 Mich 331, 338; 132 NW2d 87 (1965), this Court will not disturb a trial court's factual findings regarding a knowing and intelligent waiver of *Miranda* rights "unless that ruling is found to be clearly erroneous." [*People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983).] Credibility is crucial in determining a defendant's level of comprehension, and the trial judge is in the best position to make this assessment.

Although we review for clear error the trial court's factual findings regarding a defendant's knowing and intelligent waiver of *Miranda* rights, we agree with the prosecution that the meaning of "knowing and intelligent" is a question of law. We review questions

---

[6] Unpublished order, entered January 11, 1999 (Docket No. 215615).

of law de novo. *McDougall v Schanz*, 461 Mich 15, 24;
597 NW2d 148 (1999).

### III. ADMISSIBILITY OF CONFESSIONS:
### AN HISTORICAL PERSPECTIVE

The United States Supreme Court originally fol-
lowed the common-law rule pertaining to the admis-
sion of confessions: that a confession was admissible
as long as it was freely and voluntarily made. See
*Hopt v Utah*, 110 US 574, 584-585; 4 S Ct 202; 28 L Ed
262 (1884).[7] Then, in *Bram v United States*, 168 US
532, 542; 18 S Ct 183; 42 L Ed 568 (1897), the Court
for the first time found the voluntariness requirement
to be grounded in the Fifth Amendment's command
that no person "shall be compelled in any criminal
case to be a witness against himself." However, the
voluntariness requirement was limited to cases in *fed-
eral* court. In *Twining v New Jersey*, 211 US 78, 114;
29 S Ct 14; 53 L Ed 97 (1908), the Court held that
"exemption from compulsory self-incrimination *in the
courts of the states* is not secured by any part of the
Federal Constitution" (emphasis added).

Beginning with *Brown v Mississippi*, 297 US 278;
56 S Ct 461; 80 L Ed 682 (1936), the Court introduced
due process as a basis for excluding involuntary con-
fessions in criminal proceedings occurring in state
courts.[8] It was held that fundamental unfairness in

---

[7] The *Hopt* Court explained that a confession should be excluded if it
was induced by threats or promises "which, operating upon the fears or
hopes of the accused . . . deprive him of that freedom of will or self-
control essential to make his confession voluntary within the meaning of
the law." *Id.* at 585.

[8] The Court relied on the Fourteenth Amendment's Due Process Clause
essentially to avoid its holding in *Twining*.

violation of due process exists "when a coerced confession is used as a means of obtaining a verdict of guilt." *Lisenba v California*, 314 US 219, 236-237; 62 S Ct 280; 86 L Ed 166 (1941). Under the Due Process Clauses of the Fifth and Fourteenth Amendments, the test for admissibility was the same as that under the Fifth Amendment's compelled self-incrimination provision, requiring " 'that the confession is made freely, voluntarily, and without compulsion or inducement of any sort.' " *Haynes v Washington*, 373 US 503, 513; 83 S Ct 1336; 10 L Ed 2d 513 (1963), quoting *Wilson v United States*, 162 US 613, 623; 16 S Ct 895; 40 L Ed 1090 (1896).

The Court eventually returned its focus to the privilege against self-incrimination. In *Malloy v Hogan*, 378 US 1, 6; 84 S Ct 1489; 12 L Ed 2d 653 (1964), the Court overruled *Twining* and held that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."[9] The Court acknowledged that the *Brown* Court "felt impelled, in light of *Twining*, to say that its conclusion did not involve the privilege against self-incrimination." *Id*. However, the Court reasoned that any distinction "was soon abandoned." *Id*. at 6-7. Thus, the *Malloy* Court concluded that

---

[9] Const 1963, art 1, § 17 also affords a right to be free from compelled self-incrimination, providing that "[n]o person shall be compelled in any criminal case to be a witness against himself . . . ." We noted in *Cheatham, supra* at 10, that "[t]he wording of the Michigan Constitution granting protection from compelled self-incrimination is identical to the Fifth Amendment protection." As in *Cheatham*, however, there is no need in this case to consider the precise nature of the protection against self-incrimination provided by the Michigan Constitution because the trial court relied exclusively on the Fifth Amendment and defendant makes no argument that art 1, § 17 should be construed differently.

today the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram v United States*, 168 US 532; 18 S Ct 183; 42 L Ed 568 [(1897)] the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Id.*, 168 US at 542; 18 S Ct at 187. Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." *Id.*, 168 US at 542-543; 18 S Ct at 186-187; see also *Hardy v United States*, 186 US 224, 229; 22 S Ct 889, 891; 46 L Ed 1137 [(1902)]; *Ziang Sung Wan v United States*, 266 US 1, 14; 45 S Ct 1, 3; 69 L Ed 131 [(1924)]; *Smith v United States*, 348 US 147, 150; 75 S Ct 194, 196; 99 L Ed 192 [(1954)]. In other words the person must not have been compelled to incriminate himself. [*Id.* at 7.]

IV. *MIRANDA v ARIZONA*

Against this backdrop, the Court in *Miranda* addressed what it believed to be the inherent coercion present in all custodial interrogations. Beginning with the premise that, because of the "compulsion inherent in custodial surroundings, no statement obtained from [a] defendant can truly be the product of his free choice," *id.* at 458, the Court fashioned a set of "procedural safeguards" in order to "permit a full opportunity to exercise the privilege against self-incrimination":

To summarize, we hold that when an individual is taken
into custody or otherwise deprived of his freedom by the
authorities in any significant way and is subjected to ques-
tioning, the privilege against self-incrimination is jeopard-
ized. Procedural safeguards must be employed to protect
the privilege and unless other fully effective means are
adopted to notify the person of his right of silence and to
assure that the exercise of the right will be scrupulously
honored, the following measures are required. He must be
warned prior to any questioning that he has the right to
remain silent, that anything he says can be used against him
in a court of law, that he has the right to the presence of an
attorney, and that if he cannot afford an attorney one will
be appointed for him prior to any questioning if he so
desires. [*Id.* at 467, 478-479.]

The Court further explained that "[t]he defendant may
waive effectuation of these rights, provided the
waiver is made voluntarily, knowingly and intelli-
gently." *Id.* at 444.

In subsequent decisions, the Supreme Court elabo-
rated on what is required for an effective waiver of
the *Miranda* rights. In *Moran v Burbine*, 475 US 412,
421; 106 S Ct 1135; 89 L Ed 2d 410 (1986), the Court
explained that "[t]he inquiry has two distinct dimen-
sions":

First, the relinquishment of the right must have been vol-
untary in the sense that it was the product of a free and
deliberate choice rather than intimidation, coercion, or
deception. Second, the waiver must have been made with a
full awareness of both the nature of the right being aban-
doned and the consequences of the decision to abandon it.
Only if the "totality of the circumstances surrounding the
interrogation" reveal both an uncoerced choice and the req-
uisite level of comprehension may a court properly con-
clude that the *Miranda* rights have been waived.

The "totality of the circumstances" approach referred to in *Moran* requires an inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the suspect's

> age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his [*Miranda*] rights, and the consequences of waiving those rights. [*Fare v Michael C*, 442 US 707, 725; 99 S Ct 2560; 61 L Ed 2d 197 (1979); see also *Cheatham, supra* at 27.]

We read *Fare* as setting forth an objective standard for determining whether *Miranda* rights are validly waived. See *United States v Yunis*, 273 US App DC 290, 302; 859 F2d 853 (1988). While, as explained below, determining whether a defendant provided a knowing and intelligent waiver necessarily involves an inquiry into the suspect's level of understanding, this can only be done by examining the objective circumstances surrounding the waiver.[10] Finally, the prosecution has the burden of establishing a valid waiver by a preponderance of the evidence. *Colorado v Connelly*, 479 US 157, 168; 107 S Ct 515; 93 L Ed 2d 473 (1986).[11]

---

[10] Contrary to the dissent's assertion, we do not suggest that a suspect's subjective mental state plays no role in a determination whether there was a knowing and intelligent *Miranda* waiver. We merely recognize that the only conceivable basis for ascertaining a suspect's subjective understanding, other than by supernatural means, which we do not possess, is to examine the objective circumstances surrounding the waiver.

[11] The dissent questions our reliance on *Connelly* in setting forth the prosecution's burden of proof in this case. The dissent suggests that, because *Connelly* involved only the voluntary prong of the *Miranda* waiver, its statement of the burden of proof is not applicable in cases involving the question whether a *Miranda* waiver was knowing and intelligent. However, *Connelly* expressly stated that "[w]henever the State bears the burden of proof in a motion to suppress a statement that the

A. VOLUNTARY PRONG OF THE *MIRANDA* WAIVER

Determining whether a waiver of *Miranda* rights was voluntary involves the same inquiry as in the due process context. In *Connelly, supra* at 169-170, the Supreme Court explained that there is "no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." Thus, whether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion. *Id.* at 170. The *Connelly* Court explained that " 'the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception . . . .' " *Id.*, quoting *Moran, supra* at 421.

In the instant case, there is no question that defendant's decision to waive his *Miranda* rights, and, concomitantly, his decision to confess, was completely voluntary. Consequently, as in *Cheatham*, our

---

defendant claims was obtained *in violation of our Miranda doctrine*, the State need prove waiver only by a preponderance of the evidence." *Connelly, supra* at 168 (emphasis added). This statement does not strike us as one of limited applicability. The lower federal courts certainly have not hesitated in applying a preponderance of the evidence standard when determining whether a *Miranda* waiver was knowing and intelligent. See, e.g., *United States v Palmer*, 203 F3d 55, 60 (CA 1, 2000); *United States v Doe*, 60 F3d 544, 546 (CA 9, 1995); *Wernert v Arn*, 819 F2d 613, 616 (CA 6, 1987).

The dissent also suggests that a higher standard is mandated by the Supreme Court's assorted references to the prosecution's "heavy burden" in proving a waiver. Perhaps the dissent has overlooked the fact that the Supreme Court in *Connelly* acknowledged its prior decisions referring to the prosecution's "heavy burden" and still adopted a preponderance of the evidence standard. *Connelly, supra* at 167-168.

As a final matter, we note that this Court also applied the preponderance of the evidence standard to the *Miranda* waiver's knowing and intelligent prong in *Cheatham, supra* at 27.

task here is to determine whether defendant's waiver was also "knowing and intelligent."

### B. KNOWING AND INTELLIGENT PRONG
### OF THE *MIRANDA* WAIVER

In contrast to the voluntary prong, determining whether a suspect's waiver was knowing and intelligent requires an inquiry into the suspect's level of understanding, irrespective of police behavior. See *United States v Bradshaw*, 290 US App DC 129, 132-134; 935 F2d 295 (1991); *Derrick v Peterson*, 924 F2d 813, 820-821 (CA 9, 1990). However, as we explained in *Cheatham, supra* at 28, "[t]o knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him." See also *Colorado v Spring*, 479 US 564, 574; 107 S Ct 851; 93 L Ed 2d 954 (1987) ("The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of [*Miranda* rights]").[12] Thus, "[l]ack of foresight is insufficient to render an otherwise proper waiver invalid." *Cheatham, supra* at 29. Rather,

---

[12] The Court in *Spring* actually referred to waiver of "the Fifth Amendment privilege." *Id.* We assume that the Court misspoke because it is illogical to talk about a waiver of the right against compelled self-incrimination. As Professor Joseph Grano explains, the idea of a waiver of the Fifth Amendment privilege would only make sense if the Fifth Amendment conferred a substantive right of silence. However, the Fifth Amendment confers not a right of silence per se, but a right not to be compelled to answer questions. See Grano, Confessions, Truth, and the Law (Ann Arbor: University of Michigan Press, 1993), pp 141-142. Thus, the *Spring* Court must have been referring to waiver of the *Miranda* rights and *not* the Fifth Amendment privilege.

[t]o establish a valid waiver, the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him. [*Id.*; see also *People v Garwood*, 205 Mich App 553, 558; 517 NW2d 843 (1994).]

We agree with the plurality in *Cheatham* that the requirement of a "knowing and intelligent" waiver of *Miranda* rights essentially forces courts to make " 'sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State.' " *Id.* at 21-22 (BOYLE, J.), quoting *Connelly*, *supra* at 167.[13] In light of the fact that the Fifth Amendment itself protects only against *compelled* self-incrimination, the requirement of a "knowing and intelligent" waiver of *Miranda* rights is puzzling.[14] As the Ninth Circuit observed in *Derrick, supra* at 821:

[T]he Court requires that there be improper state action under the [F]ourteenth [A]mendment before a confession can be suppressed, but requires no such state action in the *Miranda* context, even though the constitutional provision underlying the *Miranda* warning—the [F]ifth [A]mendment—is applied to the states through that same [F]ourteenth [A]mendment.

---

[13] *Cheatham* was a majority opinion with the exception of part III, in which Justice BOYLE, joined by Chief Justice BRICKLEY and Justice RILEY, discussed what she believed to be an inconsistency between the voluntary and knowing and intelligent prongs of the *Miranda* waiver analysis.

[14] As the Supreme Court recognized in *Connelly*, *supra* at 170, "the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' " The *Connelly* Court further emphasized: "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.*

Before the Supreme Court's recent decision in *Dickerson v United States*, 530 US 428; 120 S Ct 2326; 147 L Ed 2d 405 (2000), this apparent incongruity was easily reconcilable, given that the Supreme Court itself had acknowledged in *at least fifteen* post-*Miranda* decisions that the *Miranda* warnings are not themselves rights protected by the Fifth Amendment, but instead are prophylactic rules designed to protect the Fifth Amendment right against self-incrimination.[15] In *Dickerson*, however, the Court abruptly changed course, holding that *Miranda* is a "constitutional decision" announcing a "constitutional rule."[16]

Although the Supreme Court has now decided that the *Miranda* rights are constitutionally mandated, the

---

[15] See, e.g., *Davis v United States*, 512 US 452, 458; 114 S Ct 2350; 129 L Ed 2d 362 (1994); *Withrow v Williams*, 507 US 680, 690-692; 113 S Ct 1745; 123 L Ed 2d 407 (1993); *McNeil v Wisconsin*, 501 US 171, 176; 111 S Ct 2204; 108 L Ed 2d 158 (1990); *Duckworth v Eagan*, 492 US 195, 203; 109 S Ct 2875; 106 L Ed 2d 166 (1989); *Arizona v Roberson*, 486 US 675, 681; 108 S Ct 2093; 100 L Ed 2d 704 (1988); *Connecticut v Barrett*, 479 US 523, 528; 107 S Ct 828; 93 L Ed 2d 920 (1987); *Moran, supra* at 424-425; *Oregon v Elstad*, 470 US 298, 305; 105 S Ct 1285; 84 L Ed 2d 222 (1985); *New York v Quarles*, 467 US 649, 654; 104 S Ct 2626; 81 L Ed 2d 550 (1984); *United States v Henry*, 447 US 264, 274; 100 S Ct 2183; 65 L Ed 2d 115 (1980); *North Carolina v Butler*, 441 US 369, 374; 99 S Ct 1755; 60 L Ed 2d 286 (1979); *Brown v Illinois*, 422 US 590, 600; 95 S Ct 2254; 45 L Ed 2d 416 (1975); *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed 2d 182 (1974); *Michigan v Payne*, 412 US 47, 53; 93 S Ct 1966; 36 L Ed 2d 736 (1973).

[16] In support of its conclusion regarding *Miranda*'s "constitutional basis," the Court first observed that it had "consistently applied *Miranda*'s rule to prosecutions arising in state courts," which action could only be justified if the *Miranda* warnings were required by the United States Constitution. *Id.* at 120 S Ct 2333.

Second, the Court noted that *Miranda* itself "is replete with statements indicating that the majority thought it was announcing a constitutional rule." *Id.* Finally, the Court found support for its conclusion that "*Miranda* is constitutionally based" in *Miranda*'s "invitation for legislative action to protect the constitutional right against coerced self-incrimination." *Id.* at 120 S Ct 2334.

Court has yet to address the apparent inconsistency between the voluntary and knowing and intelligent prongs of the *Miranda* waiver analysis. Until it does so, our duty is to accept and attempt to apply *Miranda* and its progeny, including the requirement of a "knowing and intelligent" waiver of the *Miranda* rights. Like the *Derrick* court, "we . . . are obligated to bifurcate the *Miranda* waiver analysis into an inspection of (1) whether the waiver was 'voluntary' and (2) whether the waiver was 'knowing' and 'intelligent.' " *Derrick, supra* at 821; see also *Cheatham, supra* at 26 (BOYLE, J.).

### V. APPLICATION

*Cheatham* represents our most recent attempt to apply the knowing and intelligent prong of the *Miranda* waiver. The trial court, in its opinion suppressing defendant's confession, interpreted our decision in *Cheatham* as requiring that a suspect be able to "apply [his *Miranda* rights] to himself and understand his relationship with the police." As a result, the trial court reasoned that defendant's delusional belief that "God would be releasing him from jail as a reward for confessing to his mother's murder" prevented him from making a knowing and intelligent decision to waive his *Miranda* rights. We conclude that the trial court erred as a matter of law because it misread *Cheatham* and, consequently, focused on *why* defendant was confessing rather than considering whether defendant could in fact understand and waive his *Miranda* rights.

Our conclusion in this regard is supported not only by the trial court's written opinion focusing on defendant's purported delusions, but by the court's

comments during defendant's *Walker* hearings. At one point during Dr. Mogy's testimony, the trial court commented that "[t]he only issue is [defendant's] *motivation* to make the statement." The court even suggested that only someone who was delusional would come forward and admit to a murder after nine years.[17] Although defendant may have believed that he would not go to jail, such a belief has nothing to do with whether defendant was able to understand " 'that he need say nothing at all and that he might then consult with a lawyer if he so desired.' " *Cheatham, supra* at 29, quoting *United States v Hall*, 396 F2d 841, 846 (CA 4, 1968). In this regard, we agree with the following statement by the Supreme Court of Illinois:

> To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail. The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that

---

[17] We reject the notion that confessing to a crime is inherently irrational. One can easily imagine circumstances in which a person would decide to confess for reasons of morality and conscience. Indeed, as Professor Grano has pointed out, there are many situations in which a guilty person with any basic sense of morality would voluntarily come forward:

> To take the easiest case, few would dispute that a guilty individual has a moral obligation to confess when his confession is necessary to prevent an innocent person from being convicted for a crime. Similarly, even aside from the possibility of erroneous conviction, a person has a moral obligation to admit that he has falsely accused another, for only by so confessing can the person hope to remove the harm wrongly caused to the other's good name. [Grano, n 12 *supra* at 41.]

In sum, there are countless reasons why a "rational" person might decide to confess past criminal activity.

one can stand mute and request a lawyer. [*In re WC*, 167 Ill
2d 307, 328; 212 Ill Dec 563; 657 NE2d 908 (1995).]

Because the trial court applied the wrong legal
standard in determining defendant's ability to make a
knowing and intelligent waiver of his *Miranda* rights,
we reverse the trial court's decision suppressing
defendant's confession. Viewing the objective circum-
stances surrounding defendant's waiver, the waiver
was clearly knowing and intelligent. Detective
Lenczewski gave undisputed testimony that, while
advising defendant of his *Miranda* rights, he had
defendant read along from a department-issued card.
Detective Lenczewski further testified that he stopped
after each warning, asked defendant if he understood,
and continued after defendant stated that he in fact
understood. The exchange ended with defendant's
direction to "get on with it." Such a remark clearly
evidences defendant's awareness of the events that
were transpiring. Defendant eventually waived his
rights and proceeded to give a detailed confession.[18]

Turning to the opinions proffered by the various
expert witnesses, although Dr. Clark admitted that it
was possible that defendant was suffering from a
delusion that affected his ability to understand his
actions, he believed such a notion to be "quite specu-
lative." Dr. Clark found no objective evidence that
defendant was not capable of understanding his
*Miranda* rights. Indeed, Dr. Clark believed that it
would be a "mystery" why defendant would tell the
police what he did if defendant did not understand to

---

[18] Actually, including his initial contact with Detroit Police Officers
Hughes and Dickinson, defendant had been read his *Miranda* rights *three*
times. Each time defendant waived his rights and made a statement.
Defendant also signed a waiver form and provided a written statement.

what use the police would put his statements. Dr.
Clark placed particular emphasis on a remark defend-
ant made at his arraignment—that the court should
"go ahead and send me to jail"—because that state-
ment was made relatively close in time to his
confession.[19]

Dr. Grisso testified that, while defendant's delusion
prevented him from appreciating the consequences of
his actions, he clearly had a "straight forward under-
standing . . . of what the *Miranda* warnings are say-
ing." With regard to defendant's understanding of the
role of the police, Dr. Grisso testified that defendant
would "understand that the police intend[ed] to jail
him." In his report submitted to the court, Dr. Grisso
explained that defendant knew what the police were
supposed to do but, because of his mental illness,
"did not believe that [] it would happen."

As stated, a knowing and intelligent waiver of the
*Miranda* rights does not require that a suspect
"understand the ramifications and consequences of
choosing to waive or exercise the rights that the
police have properly explained to him." *Cheatham*,
*supra* at 28. Rather, a very basic understanding is all
that is necessary for a valid waiver.

The Supreme Court has made clear that a defend-
ant need not have a wise or shrewd basis for waiving
*Miranda* rights for the waiver to be valid. In *Connect-
icut v Barrett*, 479 US 523, 525-526; 107 S Ct 828; 93 L
Ed 2d 920 (1987), the Court considered a case in
which a defendant orally confessed to a crime, but
refused to make a written statement without the pres-

---

[19] Dr. Clark explained that "[t]he more contemporaneous the informa-
tion is you're looking at, the more [it] goes to the question to what his
state of mind was at the time [of the confession]."

ence of counsel. In the course of concluding that *Miranda* did not require suppression of the defendant's oral statements, the Court stated that "[t]he fact that some might find [the defendant's] decision [to confess] illogical is irrelevant, for we have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.' " *Id.* at 530 (citation omitted). Similarly, in *Spring, supra*, the Court considered a case in which the police interrogated the defendant without telling him all the crimes at which the interrogation was aimed. In concluding that this lack of information did not affect the validity of the defendant's waiver of his *Miranda* rights, the Court held that "the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 577.

Thus, it is clear that the United States Supreme Court does not equate a "knowing and intelligent" waiver of *Miranda* rights with a wise or lawyer-inspired decision to waive those rights.[20] A trial court's determination of whether a waiver of *Miranda* rights is "knowing and intelligent" should *not* involve any determination whether the decision to waive those rights is actually a wise decision in terms of the defendant's self-interest. Rather, the *only* inquiry with regard to a "knowing and intelligent" waiver of *Miranda* rights is, as stated, whether the defendant understood "that he did not have to speak, that he had the right to the presence of counsel, and that the

---

[20] We agree with Professor Grano that "*Miranda*'s justification for recognizing a right to counsel has nothing to do with helping the defendant to make strategically wise decisions." Grano, n 12 *supra* at 170.

state could use what he said in a later trial against
him." *Cheatham, supra* at 29.

Here, even Dr. Mogy, who testified at length about
defendant's supposed belief that "God was going to
free him," acknowledged that defendant "did, at some
point, seem to be aware that he could go to jail for
making these statements." Dr. Mogy's basic position
was that defendant simply ignored the consequences
of confessing because of his delusions, not that
defendant could not understand those consequences.
Indeed, Dr. Mogy acknowledged that defendant could
understand the literal aspects of his *Miranda* rights.

In its opinion, the trial court expressly found "the
testimony and reports of Dr. Mogy and Dr. Grisso to
accurately reflect the nature of [d]efendant's mental
state" at the time that defendant waived his *Miranda*
rights. The trial court also noted that "Dr. Grisso testi-
fied that while [d]*efendant did have an intellectual
understanding of the rights* he was read, his delu-
sions prevented him from appreciating those rights as
they applied to his own situation" (emphasis added).
Finally, the trial court stated that "this case presents a
defendant with the intellectual capability of under-
standing the rights which [were] read to him." Thus, it
is plain that the trial court found that defendant
understood his *Miranda* rights. That should have
ended the trial court's inquiry because a basic under-
standing is all that is required for a knowing and
intelligent waiver of *Miranda* rights. The trial court
erred in suppressing defendant's confession.[21]

---

[21] The dissent maintains that our analysis confuses separate legal and
factual issues. To the contrary, we merely hold that the trial court erred as
a matter of law in focusing on defendant's motivation for confessing.
Given the trial court's unique position as factfinder, we might ordinarily

### VI. CONCLUSION

For the reasons stated, the trial court erred as a matter of law in concluding that defendant's claimed delusional belief that God would set him free prevented him from knowingly and intelligently waiving his *Miranda* rights. Moreover, as in *Cheatham, supra* at 31, there is no evidence that, " 'at the time the warnings were given and during the subsequent questioning, Defendant manifested expressly or by implication from [his] words and actions any lack of comprehension of what was said to [him] or of what was occurring' " (citation omitted).[22] Accordingly, we reverse the trial court's decision suppressing defendant's confession.

WEAVER, C.J., and TAYLOR, CORRIGAN, and MARKMAN, JJ., concurred with YOUNG, J.

CAVANAGH, J. I dissent. The majority, under the guise of applying well-established rules of law, creates an unduly restrictive rule for examining waiver of the Fifth Amendment privilege against self-incrimination

---

remand a case for reconsideration under these circumstances. However, because the trial court's own factual findings (as well as the objective circumstances surrounding defendant's *Miranda* waiver that the trial court ignored) support our conclusion that defendant's waiver was knowing and intelligent, there simply is no need for a remand here.

[22] According to the dissent, one of the "primary problems" with our analysis is that we "assume[] that cases involving mentally ill defendants may be easily analogized to cases involving persons with low intelligent quotas." *Post* at 654. However, other than this conclusory allegation, the dissent fails to explain exactly what "analogy" our opinion draws between this case and *Cheatham*. We have never suggested that mental illness is the same as having a low I.Q. We merely recognize the obvious: both conditions could conceivably affect a suspect's ability to provide a knowing and intelligent *Miranda* waiver. However, our conclusion here is that there is no objective evidence that defendant's mental illness prevented him from understanding his *Miranda* rights.

as protected by *Miranda v Arizona*, 384 US 436; 86 S
Ct 1602; 16 L Ed 2d 694 (1966).[1] The question
presented on appeal is much more complex than the
majority implies. I would hold that the trial court did
not clearly err in its determinations that the defend-
ant was delusional at the time he confessed and that
he was unable to understand the actual consequences
that could arise as a result of his confession. I would
further affirm the legal conclusions drawn below
because the prosecution did not carry its burden of
proving that the defendant knowingly and intelligently
waived his constitutionally protected rights under the
totality of the circumstances.

---

[1] I expressly disagree with the majority's editorialism that

[i]n light of the fact that the Fifth Amendment itself protects only
against compelled self-incrimination, the requirement of a "know-
ing and intelligent" waiver of *Miranda* rights is puzzling. [*Ante* at
637.]

I further disagree with the dicta following the majority's conclusion. *Id.* at
645. As I pointed out in *People v Cheatham*, 453 Mich 1, 30, 57; 551 NW2d
355 (1996), the overarching consideration in *Miranda*-waiver cases is not
deterrence, but rather the protection and vindication of constitutional
rights. See also *Dickerson v United States*, 530 US 428; 120 S Ct 2326; 147
L Ed 2d 481 (2000).

I am not puzzled by the Supreme Court's bifurcation of the *Miranda*-
waiver analysis, because the voluntariness prong protects aspects of the
defendant's rights distinct from the aspects protected by the knowing and
intelligent prong. The voluntariness prong of *Miranda* seeks to protect
defendants against the compulsion envisioned by the Fifth Amendment.
*Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986).
The knowing and intelligent prong ensures that a suspect understands the
substantive protections of the Fifth Amendment as incorporated into the
Fourteenth Amendment. *Id.* For these reasons, I do not share the major-
ity's hesitation to follow case law requiring that a defendant be able to
understand his rights as a prerequisite to waiving them.

I

## A. STANDARD OF REVIEW

I agree with the majority that "we review for clear error the trial court's factual findings regarding a defendant's knowing and intelligent waiver of *Miranda* rights . . . ." *Ante* at 629, citing *People v Cheatham*, 453 Mich 1, 30; 551 NW2d 355 (1996). I further agree that questions of law are reviewed de novo. *Ante* at 629-630. Yet, the majority opinion is incomplete to the extent that it: (1) fails to fully explore the burden of proof that must be borne by the prosecution, and (2) fails to distinguish the factual issues from the legal issues in this case.

## B. PROSECUTORIAL BURDEN

The majority announces that "the prosecution has the burden of establishing a valid waiver by a preponderance of the evidence." *Ante* at 634. Although I am willing to proceed under the assumption that the burden of proof is by a preponderance of the evidence because the prosecution failed to prove its case even by a preponderance, I do not believe that the applicable burden is as clearly established as the majority implies.

The preponderance test employed by the majority springs from *Colorado v Connelly*, 479 US 157, 168; 107 S Ct 515; 93 L Ed 2d 473 (1986), a United States Supreme Court case discussing the voluntary waiver of constitutional rights protected by *Miranda*. Traditionally, constitutional waiver cases place a "heavy" burden on the prosecution. *Johnson v Zerbst*, 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938); see, also, *Colorado v Spring*, 479 US 564, 581; 107 S Ct 851; 93

L Ed 2d 954 (1987) (Marshall, J., dissenting), and *Connecticut v Barrett*, 479 US 523, 531; 107 S Ct 828; 93 L Ed 2d 920 (1987) (Brennan, J., concurring). Our Supreme Court has also recognized that, " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights, and that we 'do not presume acquiescence in the loss of fundamental rights.' " *Johnson* at 464.

To date, the United States Supreme Court has never expressly declared that a preponderance standard should be applied in knowing and intelligent waiver cases. In *Connelly* itself, Justice Brennan's dissent reiterated the fact that *Connelly* was a voluntariness case, *Connelly* at 187-188, and explained why the imposition of a preponderance standard was undesirable:

> In holding that the government need only prove the voluntariness of the waiver of *Miranda* rights by a preponderance of the evidence, the Court ignores the explicit command of *Miranda*: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. This Court has always set high standards of proof for the waiver of constitutional rights, and we re-assert these standards as applied to in-custody interrogation." . . . In recognition of the importance of the Due Process Clause and the Fifth Amendment, we always have characterized the State's burden of proof on a *Miranda* waiver as "great" and "heavy." [*Id.* at 184-185.]

Although *Connelly*'s imposition of the preponderance standard arguably extends to knowing and intelligent waiver cases, the proposition is certainly open to debate. In announcing the preponderance standard

in *Connelly*, the Supreme Court examined cases involving the exclusion of evidence, and built upon other cases examining voluntary waiver. *Connelly* at 167-169. The United States Supreme Court's recent recognition that *Miranda* was a constitutional decision,[2] lends some support that *Connelly*'s rationale should not be extended to knowing and intelligent cases.

The majority is correct that the Supreme Court stated that "[w]henever the [s]tate bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the [s]tate need prove waiver only by preponderance of the evidence." *Connelly* at 168. The entirety of the Supreme Court's statement was as follows, however, "We now reaffirm our holding in *Lego*: Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *Connelly* at 168, referring to *Lego v Twomey*, 404 US 477; 92 S Ct 619; 30 L Ed 2d 618 (1972). In *Lego*, the inquiry focused solely on voluntariness. There, the Supreme Court held: "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary. Of course, the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." *Id.* at 489.

---

[2] See *Dickerson*, n 1 *supra* at 120 S Ct 2334, n 4.

### C. FACTUAL ISSUES v LEGAL ISSUES

Although the majority recognizes that the trial court's findings of fact must be reviewed for clear error, nowhere does the majority apply the standard it announces. Instead, the opinion proceeds with an open-ended analysis after concluding that "the meaning of 'knowing and intelligent' is a question of law." *Ante* at 629. After broadly categorizing the entire discussion as a legal issue, the majority then conducts an independent review of the trial court's factual findings. See *id.* at 639-644.

Given the broad range of issues that may be considered factual, I am not prepared to summarily conclude that all questions remotely related to the knowing and intelligent inquiry are legal in nature. Rather, it is incumbent upon us to laboriously separate the factual issues from those issues that are purely legal, and to separate legal conclusions from factual inferences.

### 1. FACTUAL ISSUES

In the present case, the trial judge weighed the credibility of the competing witnesses and found "the testimony and reports of Dr. Mogy and Dr. Grisso to accurately reflect the nature of Defendant's mental state at the time," and that "there is no question that Defendant, at the time of his arrest, was psychotic." The trial court also expressly stated:

> The nature and subject matter of Defendant's delusions prevented rational comprehension of the specific topic at issue—his right to counsel and his right against self-incrimination. His delusional process required self-incrimination to effectuate freedom.

As previously noted, in *Miranda*-waiver cases, findings of fact made by the trial judge are entitled to deference unless clearly erroneous. In order to overturn a trial judge's findings as clearly erroneous, we must be left with the "definite and firm conviction that the trial court made a mistake." *People v Burrell*, 417 Mich 439, 449; 339 NW2d 403 (1983). I am left with no such conviction in this case. Clearly, the trial judge weighed the competing testimony, considered the credibility of the expert witnesses, and made a reasoned interpretation after thorough deliberation. Nothing in the record convinces me that the trial court made a mistake. I would, therefore, hold that the trial judge's factual findings were not clearly erroneous.

### 2. LEGAL ISSUES AND PREMISES

Because the trial judge's findings were not clearly erroneous, the key legal question in this case is whether the defendant could knowingly and intelligently waive his rights despite the delusion causing him to believe that God would set him free as a reward for confessing. As stated previously, questions of law are reviewed de novo. Yet, the concept of de novo review does not relieve this Court of its duty to operate within the constitutional parameters.

It is well settled that our examination of *Miranda*-based knowing and intelligent waiver cases must proceed with a consideration of the totality of the circumstances. See *Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986). The United States Supreme Court has expressly stated:

> [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. [*Fare v Michael C*, 442 US 707, 724-725; 99 S Ct 2560; 61 L Ed 2d 197 (1979).]

In *Fare,* the Supreme Court examined whether a juvenile defendant waived his Fifth Amendment rights as protected by *Miranda* even though he asked to see his probation officer. In holding that the waiver determination must be made pursuant to a totality of the circumstances inquiry, the Supreme Court stated:

> There is no reason to assume that such courts—especially juvenile courts, with their special expertise in this area—will be unable to apply the totality-of-the-circumstances analysis so as to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved. Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. [*Id.* at 725.]

The Supreme Court then went on to apply the totality of the circumstances test, and concluded that "no special factors indicate that respondent was unable to understand the nature of his actions" and that "[t]here is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be." *Id.* at 726.

The majority summarily cites *Fare* for the proposition that courts should examine *Miranda* waivers objectively. Although the totality of the circumstances test has an objective component, I believe that *Fare* clearly explained that courts have the flexibility to consider special factors that may affect waiver. Mental illness fits naturally within the totality of the circumstances test, and it may be a factor tending to indicate that the defendant cannot "understand the rights he [is] waiving, or what the consequences of that waiver would be." *Id.*

### D. APPLICATION

In the present case, the prosecution argues only: (1) that the trial court clearly erred in its factual findings, and (2) that the law does not require that the defendant be able to comprehend how *Miranda* applies to his own situation. As stated previously, I am unconvinced that the trial judge clearly erred. Similarly, I believe that the prosecutor has proceeded under a flawed legal interpretation of *Miranda*. The prosecution has offered nothing to persuade me that mental illness should not be factored into the totality of the circumstances equation. Thus, the prosecutor's case must fail, even by a preponderance of the evidence.

II

Nothing in the majority opinion persuades me that only a literal understanding of *Miranda* is required. Not only does the majority build its case upon a shaky foundation, but it supports its substantive legal arguments with premises that are only tangentially

relevant. I see two primary problems with the analysis offered by the majority: (1) it quotes case law only selectively, and (2) it assumes that cases involving mentally ill defendants may be easily analogized to cases involving persons with low intelligence quotas.

### A. WHAT THE CASE LAW SAYS
### BUT THE MAJORITY DOES NOT

The majority begins its knowing and intelligent waiver analysis by stating that, though determining whether a suspect's waiver was knowing and intelligent requires a degree of subjective inquiry,[3] suspects need not understand the consequences of waiver. *Ante* at 637. Yet the quotations the majority selects are taken from opinions that leave open the possibility that the defendant's level of comprehension about the consequences of waiver will be relevant. None of the authority cited by the majority holds that a waiver will be valid per se if the defendant is able to literally comprehend *Miranda*, even though that defendant may be unable to apply the literal meaning of *Miranda* to his own situation.

The majority erroneously concludes that the trial court misapplied *Cheatham* by requiring that the defendant be able to understand how his *Miranda* rights applied to his situation. The majority quotes *Cheatham* for the proposition that, " '[t]o knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have prop-

---

[3] Curiously, the majority levies the charge that I somehow interpret the majority opinion as suggesting "that a suspect's subjective mental state plays no role in a determination whether there was a knowing and intelligent *Miranda* waiver." *Ante* at 634, n 10. Obviously, that is not the case.

erly explained to him.' " *Ante* at 636, quoting *Cheatham* at 28. However, when the aforementioned quotation is taken in the context of the entire *Cheatham* opinion, the quotation does not so easily support the majority's holding.

As a preliminary matter, it is important to note that the *Cheatham* Court did not hold that courts need not ever determine whether a defendant understood the consequences of his actions. Rather, *Cheatham* held only that defendant Cheatham sufficiently understood his rights, and that he had the capacity to provide a valid waiver. *Id.* at 27. Unlike the present case, *Cheatham* focused on the defendant's intellectual capacity, and the analysis of that intellectual capacity was implicitly tied to the defendant's understanding of his own circumstances. The *Cheatham* excerpt quoted by the majority was taken from the middle of *Cheatham*'s totality of the circumstances analysis. When read in context, it is apparent that the Court was examining both whether the defendant literally understood the *Miranda* warnings, as well as whether he understood the meanings of the words as applied to his own situation.

Similarly, the majority's citation of *Colorado v Spring*, *supra*, provides little support for the proposition that the defendant must only possess a literal understanding of the *Miranda* warnings in order to provide a knowing and intelligent waiver. While the *Spring* Court explicitly stated that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," *id.* at 574, it also stated, "In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by

the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials." *Id.* at 575. Thus, *Spring* implicitly recognizes that, if a defendant does misunderstand the consequences of speaking freely to law enforcement officials, then his *Miranda* waiver could be considered invalid under the knowing and intelligent prong. A conclusion that a defendant need not understand every consequence of confessing is different than a conclusion that the defendant must understand the most basic consequences of confessing. This case presents exactly the type of situation envisioned but not presented in *Spring*—the defendant misunderstood the consequences of speaking freely to the police. He lacked a basic comprehension of what could actually occur if he waived his rights.

The trial court's analysis comports with Supreme Court observations that a defendant must possess at least a basic understanding of his rights under the totality of the circumstances. See, e.g., *Moran* at 421. Although the defendant may have been able to understand what it means to be silent, to have a lawyer present, and to have his statements used against him, his decision to confess was directly tied to his delusion that God would control the police and set him free. It is, therefore, questionable whether the defendant ever truly comprehended the actual meaning of the *Miranda* warnings.

As I wrote in *Cheatham*, "the ultimate focus for purposes of the knowing and intelligent prong remains on the level of the suspect's comprehension." *Id.* at 56. I further agree with Justice MALLETT's *Cheatham* assessment that "[t]he validity of a waiver

does not depend on a verbatim recitation of the *Miranda* litany, but rather depends on an actual understanding on the part of the individual of his *Miranda* rights and the consequences of waiving them." *Id.* at 59. Even the *Cheatham* lead opinion recognized that the knowing and intelligent prong of *Miranda* focuses "on the knowledge of the accused irrespective of improper police behavior," *id.* at 18, and that courts must evaluate whether the defendant has the capacity to understand the warnings given to him under all the circumstances. *Id.* at 27.

### B. WHAT THE MAJORITY SAYS
### BUT THE CASE LAW DOES NOT

The majority secondarily finds support for its holding from the proposition that "a defendant need not have a wise or shrewd basis for waiving *Miranda* rights for the waiver to be valid." *Ante* at 642. The majority accurately points to precedent providing that the defendant cannot successfully challenge a waiver as invalid on the basis that he failed to realize that his decision was imprudent. *Id.* at 642-644.[4] However, I fail to see how wisdom is relevant to this defendant's confession. This case differs from the cases offered in support of the majority opinion in that the defendant's waiver defense springs not from a lack of wisdom, but from an inability to fully understand that the dictionary meaning of the *Miranda* warning would actually apply to his own circumstances. The trial court held that his delusions about the consequences of his actions brought about his confession. No

---

[4] Citing *Cheatham, Spring,* and *Connecticut v Barrett, supra* at 525-526.

amount of information or wisdom would have altered the delusion compelling the defendant to confess. Even a fully informed person or a person with a genius level intelligence quotient can suffer from a delusional perception of reality. Mental illness and shrewdness are simply not equivalent concepts.

III

The prosecutor has failed to carry its burden that this defendant provided a knowing and intelligent waiver. Similarly, the majority has failed to persuade me that its conclusions are supportable. I am not prepared to sign an opinion that narrows *Miranda*'s knowing and intelligent prong to the point of near extinction, especially when the opinion only pretends to hide behind well-established principles.

I would hold that the totality of the circumstances test allows a determination whether an individual defendant's mental illness precludes him from knowingly and intelligently waiving his rights. Here, the defendant's delusional episodes vitiated his ability to knowingly and intelligently waive his rights. I would, therefore, affirm the decision of the Court of Appeals.

KELLY, J., concurred with CAVANAGH, J.