*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GREGORY RAYMOND DELMARTER,

        Defendant-Appellant.

UNPUBLISHED
May 7, 2019

No. 342300
Huron Circuit Court
LC No. 17-306191-FH

Before: BOONSTRA, P.J., and METER and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of operating or maintaining a methamphetamine laboratory, MCL 333.7401c(2)(f); possession of methamphetamine, MCL 333.7403(2)(b)(*i*); operating or maintaining a methamphetamine laboratory within 500 feet of a residence, MCL 333.7401c(2)(d); possession with intent to deliver methamphetamine, MCL 333.7401(2)(b)(*i*); operating or maintaining a methamphetamine laboratory involving hazardous waste, MCL 333.7401c(2)(c); and two counts of delivery of methamphetamine, MCL 333.7401(2)(b)(*i*). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 14 to 40 years for each conviction.[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Jonathan Boyce (Jonathan) asked defendant, his former neighbor, to travel from Mount Pleasant to Bad Axe to help him "cook" methamphetamine as they had done many times in the past. On May 24, 2017, Jonathan, his brother Michael Boyce (Michael), and Michael's girlfriend Hope Rowley met defendant in Bay City and drove him to Bad Axe. On the way

---

[1] In the judgment of sentence, the trial court indicated that the seven sentences were to be served concurrently with each other, but consecutively to the sentences imposed in three separate lower court case files.

there, the group stopped in Caro to buy the necessary supplies, including over-the-counter medication containing pseudoephedrine. Upon arriving in Bad Axe, they proceeded to a barn on Sullivan Road (the barn) that was owned by Jonathan's aunt, where they intended to cook the methamphetamine both for sale and for personal use.

On the same day, and at defendant's request, defendant's girlfriend Denise Williams drove with her friend Billie Angell from Mount Pleasant to Bad Axe. Williams drove Angell's maroon Ford Explorer and met defendant at Jonathan's mother's house on Whitelam Street. Williams, Angell, and defendant then went to a Walgreens store, where Angell purchased a box of medication containing pseudoephedrine. They next went to a Walmart store, where Williams purchased coffee filters and containers to be used for packaging methamphetamine, and where defendant purchased additional medication containing pseudoephedrine. The three returned to the Whitelam Street house and smoked methamphetamine provided by defendant. That night, Jonathan and defendant packed up the supplies that they had purchased, left the Whitelam Street house, and went to the barn on Sullivan Road. Williams and Angell met them at the barn in Angell's Ford Explorer, bringing with them the supplies that they had purchased. Defendant assisted with the preparation of the chemicals and materials that were used to make methamphetamine while Jonathan "cooked" the methamphetamine. Defendant gave methamphetamine to Williams and Angell for their personal use that night. After making the methamphetamine, defendant and Jonathan gathered the remaining supplies into bags and took them back to the Whitelam Street house.

The following night, defendant, Jonathan, and Ray Lane (Jonathan's cousin) returned to the barn with the supplies. Lane served as a lookout while defendant again assisted Jonathan in cooking methamphetamine. Afterwards, defendant and Jonathan again packed up the supplies and took them back to the Whitelam Street house, leaving Lane to clean up the barn.

The activity at the barn caused a neighbor to contact the Huron County Sheriff's Department. The neighbor told Deputy Ryan Swartz that he had seen a Ford Explorer dropping people off along the road and that the people were running through the field to the barn at night carrying bags. Deputy Swartz and Detective Daryl Ford canvassed the area and located the Explorer in the driveway of the Whitelam Street house. Deputy Swartz's investigation into the ownership of the Explorer and the suspected residents of the Whitelam Street house produced evidence of frequent pseudoephedrine purchases by Angell, Jonathan, Michael, and two other residents of the Whitelam Street house, Robert and Kasandra Woodchisky. The pseudoephedrine purchases, combined with the activity at the barn, led to the issuance of search warrants for both the Whitelam Street house and the Sullivan Road barn. The search warrant was executed at the Whitelam Street house around 9:00 a.m. on May 26. Defendant was present and was arrested; a search of his person revealed a lid to a vial that later tested positive for methamphetamine residue, a tool for removing lithium from batteries, and $600. The other parties involved in obtaining materials and manufacturing methamphetamine, including Jonathan, Lane, Williams, and Angell, were also arrested and later testified at defendant's trial pursuant to plea deals.

While at the Whitelam Street house, officers observed a bag, to which plastic tubing was attached and from which smoke was emanating, prompting officers to contact the Sanilac County Drug Task Force to assess the scene before the search continued. Sergeant Michael Moore

entered the house in protective gear to assess the scene; he recorded video and took photographs of the interior of the house. The searches of both the Whitelam Street house and the Sullivan Road barn revealed evidence of methamphetamine production.

Defendant was given *Miranda*[2] warnings after his arrest and, after waiving his constitutional rights, gave brief statements to officers at the scene. He again waived his rights later that evening at the jail, gave written answers to questions posed by Bad Axe Police Department Detective Kevin Knoblock and Detective Ford, and admitted to purchasing medication containing pseudoephedrine and other materials to give to Jonathan in exchange for methamphetamine.

Before trial, defendant moved to suppress his statements to the police, arguing that his *Miranda* waivers were not valid due to his intoxication by methamphetamine. After a *Walker*[3] hearing, the trial court found defendant's statements to be admissible. Defendant also moved to suppress evidence found in the course of the search warrants at the house and barn; the trial court held that defendant lacked standing to challenge the warrant with respect to the barn, and that sufficient probable cause supported the issuance of the warrant to search the house. Also before trial, the prosecution sought, over defendant's objection, to introduce other-acts evidence under MRE 404(b) concerning defendant and Jonathan's history of cooking methamphetamine together. The trial court held that the proffered evidence was admissible.

During trial, the prosecution sought to admit Facebook Messenger conversations, retrieved from Jonathan's cell phone, between defendant and Jonathan. Defendant objected on the ground that the prosecution had violated the trial court's discovery order by producing these messages only a week before trial. The trial court, while acknowledging that the messages could have been retrieved from the phone sooner, held that defendant had had sufficient time to review the messages or to request an adjournment to permit additional time to review them.

Defendant's theory of the case at trial was that Jonathan was the "mastermind" in making methamphetamine and that defendant was simply a handyman and an addict who had come to Bad Axe to perform some electrical work at the barn and who had purchased pseudoephedrine products and other supplies for Jonathan in exchange for methamphetamine to "feed his own habit." The jury convicted defendant as described. This appeal followed.

## II. ADMISSION OF DEFENDANT'S STATEMENTS

Defendant argues, as he did before the trial court, that his level of intoxication rendered him unable to voluntarily and knowingly waive his constitutional rights and, therefore, that his statements should have been suppressed. We disagree. We review de novo a trial court's determination that a waiver was knowing, intelligent, and voluntary. *People v Daoud*, 462 Mich 621, 629-630; 614 NW2d 152 (2000). We review for clear error a trial court's factual findings

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1996).

[3] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

on a motion to suppress. *People v Henry (After Remand)*, 305 Mich App 127, 128; 854 NW2d 114 (2014).

Generally, "[s]tatements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). If a suspect has been afforded *Miranda* warnings before being subjected to a custodial interrogation and waives his constitutional rights, subsequent incriminating statements may be used against him. *People v Tanner*, 496 Mich 199, 209; 853 NW2d 653 (2014). "In evaluating the admissibility of a particular statement, we review the totality of the circumstances surrounding the making of the statement to determine whether it was freely and voluntarily made in light of the factors set forth by our Supreme Court . . . ." *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000) (quotation marks and citations omitted). In *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988), our Supreme Court provided a nonexhaustive list of factors to consider in evaluating the admissibility of a custodial statement, including "whether the accused was . . . intoxicated." But "[t]he absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness[;]" rather, the ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id*.

Detective Knoblock testified that when he spoke with defendant on the scene after his arrest, defendant was standing and was not swaying, and that his words were not garbled. He appeared to be oriented as to time and place, and his responses were in context to the questions asked. Detective Ford testified that during the jail interview later that evening, defendant provided specific written responses that were consistent with the questions posed. Defendant was not swaying in his seat, did not garble his words, appeared oriented as to time and place, and did not have any difficulty holding a pen or writing. Defendant specifically told Detective Ford that he was not under the influence of any drugs or alcohol, and gave no indication, by his words, his appearance, or his actions, that he was under the influence of anything at the time of the 75-minute statement.[4] At the time of the second interview, it had been at least eight hours since defendant had been arrested and he had no opportunity to use drugs during that time.

The trial court reviewed the video recordings of defendant's interviews and his written statement, and also considered the testimony of Detectives Ford and Knoblock, and found no evidence that defendant's statements were involuntary because of intoxication. We agree with the trial court. Defendant exhibited no signs of excessive intoxication during either of his interviews. Defendant was not loud or belligerent. His responses were in context to the questions. During the evening interview, he appeared frustrated at times, but remained seated in his chair and acted appropriately. Defendant wrote legible and coherent answers to the questions posed to him. And both Detective Ford and Detective Knoblock testified that, based on their

---

[4] Detective Ford testified that he is not a drug recognition expert but, based on his training and experience, defendant did not appear to be under the influence of drugs during the interview at the jail.

experience, defendant did not exhibit signs of intoxication. In short, there was no evidence, other than defendant's own testimony that he was not "thinking properly" due to methamphetamine intoxication, that defendant was so intoxicated at his interviews that he did could not knowingly and voluntarily waive his constitutional rights.[5] The trial court did not err by determining that defendant knowingly and voluntarily waived his constitutional rights and by denying defendant's motion to suppress his statements.

### III. SEARCH WARRANT—SULLIVAN ROAD BARN

Defendant also argues that the trial court erred by finding that defendant lacked standing to challenge the search of the Sullivan Road barn, because Lane had engaged him to do electrical work on the barn and he therefore had a reasonable expectation of privacy. We disagree. This Court reviews de novo the trial court's ultimate ruling on a motion to suppress evidence, while reviewing its factual findings for clear error. *People v Barbarich*, 291 Mich App 468, 471; 807 NW2d 56 (2011).

In deciding whether a Fourth Amendment violation has occurred, this Court must first determine whether a complainant had a reasonable expectation of privacy in the location that was searched, so as to afford him or her standing to challenge the search. *People v Powell*, 235 Mich App 557, 561; 599 NW2d 499 (1999). The defendant bears the burden of establishing standing. *Id*. An expectation of privacy is legitimate only if the individual exhibited an actual, subjective expectation of privacy and that actual expectation is one that society recognizes as reasonable. *People v Taylor*, 253 Mich App 399, 404; 655 NW2d 291 (2002).

Defendant's argument that he had an expectation of privacy in the Sullivan Road barn because he "worked there" [6] is not supported by the record. Defendant presented no evidence that he was employed to perform electrical work in the barn. Further, even assuming that defendant was engaged to perform temporary work in someone else's barn, this does not afford the same expectation of privacy as one might have in his or her own permanent workplace. See *Powell*, 235 Mich App at 563. Moreover, defendant had only arrived in Bad Axe two days before the execution of the search warrant, and his "tool" bag allegedly containing his work tools was found to also contain components to manufacture methamphetamine. The testimony of other witnesses supports the conclusion that defendant came to Bad Axe, and to the Sullivan

---

[5] To the extent that defendant seemingly suggests on appeal that he waived his constitutional rights after being deprived of food, water, and sleep, he admitted at the *Walker* hearing that he had been given food and water at the jail and had not been prevented from sleeping.

[6] To the extent that defendant argues that he had a reasonable expectation of privacy in the barn because, with Lane's permission, he left property there and spent nights there, he has provided no citation to the record to support these factual assertions. See MCR 7.212(C)(7). Further, defendant asserted in his motion to suppress that he spent the three nights that he was in Bad Axe as an overnight guest at the Whitelam Street house.

Road barn, to cook, use, and sell methamphetamine, not to engage in electrical work. The trial court did not clearly err by finding that defendant did not have a reasonable expectation of privacy in the Sullivan Road barn as his workplace, and that defendant lacked standing to challenge the search of the barn. *Barbarich*, 291 Mich App at 471.

IV. ADMISSION OF OTHER-ACTS EVIDENCE

Defendant also argues that the trial court abused its discretion by allowing the prosecution to introduce evidence, under MRE 404(b)(1), in the form of Jonathan's testimony about defendant's ongoing history of manufacturing methamphetamine, because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, see MRE 403. We disagree. "The decision to admit evidence is within a trial court's discretion, which is reviewed for an abuse of that discretion." *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Bynum*, 496 Mich at 623.

Under MRE 404(b)(1), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. Therefore, if the sole purpose in offering the evidence is to show a defendant's propensity for particular conduct based on his character as inferred from other wrongful conduct, it is not admissible. *People v Gimotty*, 216 Mich App 254, 259; 549 NW2d 39 (1996). Such evidence may be admissible, however, for another purpose, "such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident," if that evidence is relevant to a material issue. MRE 404(b)(1).

Our Supreme Court has explained the standard for determining the admission of other-acts evidence:

> "First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury." [*People v Denson*, 500 Mich 385, 398; 902 NW2d 306 (2017), quoting *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).]

In this case, the trial court admitted the evidence to show a scheme, plan, or system in doing an act. "[E]vidence of other instances of . . . misconduct that establish a scheme, plan, or system may be material in the sense that the evidence proves that the charged act was committed." *People v Sabin (After Remand)*, 463 Mich 43, 62; 614 NW2d 888 (2000). Other acts are logically relevant for this purpose "where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Id*. at 63. "[D]istinctive and unusual features are not required to

establish the existence of a common design or plan. The evidence of uncharged acts needs only to support the inference that the defendant employed the common plan in committing the charged offense." *People v Hine*, 467 Mich 242, 252-253; 650 NW2d 659 (2002).

The other-acts evidence admitted at trial showed that defendant and Jonathan had a history of manufacturing methamphetamine together since January 1, 2017, with defendant obtaining and preparing the components for Jonathan to "cook," and that the methamphetamine was made for consumption and for sale. This evidence supported an inference in this case that defendant would purchase or engage others to purchase the supplies needed for the manufacture of methamphetamine and that he prepared the components for Jonathan to cook as part of a concerted scheme, plan, or system to manufacture methamphetamine for both personal use and sale. Therefore, the evidence was admitted for a proper purpose.

To be logically relevant to a proper purpose, other-acts evidence must be both material and probative. *Denson*, 500 Mich at 401. To be material, evidence must be related to "any fact that is of consequence to the determination of the action." MRE 401; see also *Denson*, 500 Mich at 401. To be probative, it must tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; see also *Denson*, 500 Mich at 401-402. In this case, defendant does not dispute that the other-acts testimony was both material to and probative of whether defendant engaged in a concerted scheme to manufacture methamphetamine for both personal use and delivery. Rather, defendant argues that the probative value of the challenged evidence was substantially outweighed by the risk of unfair prejudice. *Denson*, 500 Mich at 398. We disagree. Evidence is not unfairly prejudicial merely because it is damaging; unfair prejudice exists when there is a danger that the jury will give marginally probative evidence undue weight. *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2002). Here, evidence that defendant and Jonathan had regularly performed the same roles in a methamphetamine-cooking operation, with defendant enlisting the help of others to purchase necessary ingredients and preparing the chemicals and materials to provide to Jonathan during the "cook," was highly relevant, especially in response to defendant's theory that he was merely a minor player in an operation dominated by Jonathan; the evidence tended to show that defendant was voluntarily engaged, as he had been many times in the past, in a scheme to cook methamphetamine for personal use and sale, and was not merely an addict trading his services for a small amount of personal-use methamphetamine. The trial court did not err by concluding that the probative value of this evidence was not substantially outweighed by the risk of unfair prejudice.

This is especially true because the trial court gave a limiting instruction. A limiting instruction is sufficient to "counterbalance any potential for prejudice spawned by the other acts evidence." *People v Martzke*, 251 Mich App 282, 295; 651 NW2d 490 (2002). Jurors are presumed to follow their instructions." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).

Accordingly, trial court did not abuse its discretion by admitting the other-acts testimony.

# V. DISCOVERY VIOLATION

Defendant also argues that the trial court erred by admitting Facebook Messenger messages exchanged between defendant and Jonathan, because the prosecution violated MCR 6.201(B)(3) by failing to timely turn over the messages that were retrieved from Jonathan's seized cell phone. We disagree. We review for an abuse of discretion a trial court's choice of remedy for an alleged discovery violation. MCR 6.201(J); *People v Jackson*, 292 Mich App 583, 591; 808 NW2d 541 (2011).

"When determining the appropriate remedy for discovery violations, the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance." *People v Banks*, 249 Mich App 247, 252; 642 NW2d 351 (2002). The exercise of discretion also requires inquiry into whether the defense made a showing of actual prejudice. *People v Taylor*, 159 Mich App 468, 482; 406 NW2d 859 (1987). The exclusion of evidence is an "extremely severe" sanction "and the judge's discretion in exercising preclusion should be limited only to an egregious case." *Id.*, quoting *People v Merritt*, 396 Mich 67, 82; 238 NW2d 31 (1976) (quotation marks omitted).

The prosecution concedes that the messages were not timely produced to defense counsel in violation of MCR 6.201(B)(3), which provides that, upon request, the prosecuting attorney must provide each defendant "any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial." Under MCR 6.201(J),

> [i]f a party fails to comply with this rule, the court, in its discretion, may order the party to provide the discovery or permit the inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances.

When defendant objected to the admission of the messages, the trial court permitted defense counsel to voir dire Deputy Swartz and Jonathan about the phone and the messages. The trial court also asked questions about the evidence and the reasons for the discovery violation. Deputy Swartz testified that the contents of the cell phone were not investigated earlier based on the assumption that the case would not be going to trial. The court expressed concern about the delayed retrieval of the messages from the phone, but ultimately found that the information was provided to defense counsel a week before trial and that counsel had sufficient time to bring the discovery violation to the court's attention in advance of trial. Under MCR 6.201(J), "[p]arties are encouraged to bring questions of noncompliance before the court at the earliest opportunity." The prosecution provided defendant with the messages at a final pretrial conference a week before trial and defendant failed to bring the issue of noncompliance before the court at that time or to move for a continuance to allow him to obtain an expert. Defendant has not demonstrated that the trial court abused its discretion by finding that the circumstances of the discovery

-8-

violation did not warrant the exclusion of the evidence.[7] *Taylor*, 159 Mich App at 482; *Jackson*, 292 Mich App at 591.

## VI. ADMISSION OF VIDEO OF THE WHITELAM STREET HOUSE

Defendant also argues that he was prejudiced by the admission of the videotaped safety assessment walkthrough of the Whitelam Street house because the video depicted components for making methamphetamine and he was not charged with operating or maintaining a methamphetamine lab at that location. Although the evidence may have been prejudicial, it was also relevant under MRE 401 because it depicted physical evidence related to the charges involving activities at the Sullivan Road barn and corroborated testimony that components were stored at the Whitelam Street house and taken to the barn for use in making methamphetamine there. The mere fact that this evidence supported the prosecution's case in chief does not render the probative value substantially outweighed by the risk of unfair prejudice. MRE 403. Further, the trial court gave a limiting instruction to clarify to the jury that the charges involving operating or maintaining a methamphetamine lab, which were charges 1, 3, and 5, pertained only to the Sullivan Road barn; the verdict form also specifically indicated that charges 1, 3, and 5 pertained only to the barn. Any risk of unfair prejudice was alleviated by the trial court's limiting instruction and the verdict form. See *People v Roscoe*, 303 Mich App 633, 646; 846 NW2d 633 (2014). The trial court did not abuse its discretion by admitting evidence of the videotaped walkthrough at the Whitelam Street house. *Bynum*, 496 Mich at 623.

## VI. STANDARD 4 BRIEF

In his Standard 4 brief,[8] defendant raises arguments related to the issues that we have already discussed earlier in this opinion. In addition, defendant argues two issues not found in

---

[7] Defendant's statement of the issue in his brief on appeal suggests that defendant is also challenging admission of the evidence on the ground that it was not properly authenticated. Defendant does not specifically support this argument with legal authority; rather, he simply notes that he argued in the trial court that "absent an expert extracting the messages from the phone and verification that the response messages were from [defendant's phone], the photographs [of the messages] were unreliable evidence" and that the "phone was stored improperly, tainting the evidence," and he states in his request for relief that "trial court erred when it admitted the text messages because the prosecution failed to make a proper foundation for the admission of the evidence." Issues not adequately briefed are deemed abandoned. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). In any event, we agree with the trial court that the testimony of Deputy Swartz and Jonathan provided sufficient authentication for admission; further, to the extent he reiterates them on appeal, defendant's trial court arguments regarding the lack of expert verification of the extraction methods used and possible deficiencies in the chain of custody went to the weight of the evidence, not its admissibility. See *People v White*, 208 Mich App 126, 133; 527 NW2d 34 (1994).

[8] A supplemental appellate brief submitted *in propria persona* by a criminal defendant under Michigan Supreme Court Administrative Order 2004-6, Standard 4.

his main appellate brief. First, defendant argues that evidence seized during the search of the Whitelam Street house should have been suppressed because the affidavit in support of the search warrant erroneously stated that Michael Boyce resided at the house, and that police did not have probable cause to search absent that information. We disagree. This Court reviews de novo a trial court's ultimate ruling on a motion to suppress evidence, while reviewing its factual findings for clear error. *Barbarich*, 291 Mich App at 471. This Court reads a search warrant and attached affidavit "in a common-sense and realistic manner" to determine whether the warrant established probable cause. *People v Russo*, 439 Mich 584, 603; 487 NW2d 698 (1992) (quotation marks and citation omitted).

The United States and Michigan Constitutions prohibit unreasonable searches and seizures and require a showing of probable cause to issue a search warrant. US Const, Am IV; Const 1963, art 1, § 11. An affidavit accompanying a search warrant is presumed to be valid. *Martin*, 271 Mich App at 311. If a search warrant affidavit contains false statements, "evidence obtained pursuant to the warrant must be suppressed if the false information was necessary to a finding of probable cause." *People v Stumpf*, 196 Mich App 218, 224; 492 NW2d 795 (1992). The defendant must show "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement was necessary to the finding of probable cause." *Martin*, 271 Mich App at 311 (quotation marks and citation omitted).

In response to defendant's challenge to the search warrant relating to the Whitelam Street house, the trial court examined the accompanying affidavit and held that if the information regarding Michael Boyce's residence were removed from the affidavit, the remaining content in the affidavit was sufficient to support a finding of probable cause. We agree with the trial court. "Probable cause exists when the facts and circumstances would allow a reasonable person to believe that the evidence of a crime or contraband sought is in the stated place." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). The affidavit prepared by Deputy Swartz stated that a confidential informant reported that he had observed suspicious activity at the Sullivan Road barn, including (1) three men sneaking into the barn, one of whom was locally known to the affiant as a drug user; (2) drivers ferrying people to and from the barn carrying bags and bottles; and (3) an event in which the driver of a maroon and tan Ford Explorer told the confidential informant that she had stopped in the area because she had a flat tire, but that the informant had subsequently observed two men, one of whom was carrying a bag, leave the barn and enter the Explorer, which drove away. The police searched for that Ford Explorer and found it parked at the Whitelam Street house. The Explorer was registered to Angell, who had purchased pseudoephedrine products 16 times and who had been blocked from purchasing it three times; the affidavit stated that in the affiant's experience, those who are blocked typically are involved in making methamphetamine. The affidavit identified four individuals believed to reside at the Whitelam Street house: the Woodchiskys, Michael, and Jonathan. It identified each as a known purchaser of pseudoephedrine, with numerous purchases between May 20, 2017 and May 24, 2017. The affidavit also stated that Swartz had reviewed surveillance video of Jonathan's pseudoephedrine purchase, which revealed that a different individual (later identified as defendant) had used Jonathan's identification to purchase the drug on May 24, and that individual's companions, including Angell, had purchased supplies commonly used in

methamphetamine production during the same shopping trip. The group had arrived at the store in the same maroon Ford Explorer seen at the Sullivan Road barn and the Whitelam Street house.

Even discounting all references to Michael,[9] the affidavit would still contain all the allegations of suspicious activity at the Sullivan Road barn, including the attempts by a known drug user and two other bag-carrying men to secretly enter the barn, the barn's connection to other occupants of the Whitelam Street house via Angell's Ford Explorer, Angell's frequent attempts to purchase pseudoephedrine products, her suspected purchase of other materials used in the manufacture of methamphetamine, and the account of defendant using Jonathan's identification to purchase pseudoephedrine products. The remaining information contained in the affidavit still provided a substantial basis for concluding that there was a fair probability that evidence of a crime would be found at the Whitelam Street house. The trial court properly found that the warrant affidavit was supported by probable cause. *Russo*, 439 Mich at 603.

Finally, defendant argues that the sentence imposed for his conviction of possession of methamphetamine is unreasonable because the sentence is more than double the high end of the guidelines for that offense. Defendant's argument is factually inaccurate. The trial court sentenced defendant within the guidelines range of 78 to 260 months for the highest-crime-class offenses. The guidelines range for the highest-crime-class offense subsumes the guidelines range for lower-crime-class offenses where the sentences are to be served concurrently. *People v Lopez*, 305 Mich App 686, 691-692; 854 NW2d 205 (2014). Therefore, defendant was sentenced within the applicable guidelines range and his sentence is presumptively reasonable. *People v Walden*, 319 Mich App 344, 360; 901 NW2d 142 (2017).

Affirmed.

/s/ Mark T. Boonstra
/s/ Patrick M. Meter
/s/ Karen M. Fort Hood

---

[9] We note that Michael himself testified to using methamphetamine, to having purchased pseudoephedrine products to give to defendant and Jonathan, and to being aware that defendant and Jonathan were engaged in the production of methamphetamine. In other words, even assuming that the affidavit erroneously stated that Michael lived at the Whitelam Street address, he admittedly was not completely uninvolved with conduct underlying the charges against defendant.