*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLICATED
May 26, 2022

Plaintiff-Appellee,

v

No. 357631
Shiawassee Circuit Court

JENNIFER ANN MONROE,

LC No. 19-004471-FH

Defendant-Appellant

Before: GLEICHER, C.J., and K. F. KELLY and PATEL, JJ.

PER CURIAM.

Jennifer Ann Monroe was interrogated for two hours by two detectives while confined to a bed in the trauma intensive care unit of a hospital. Monroe was not read her *Miranda*[1] rights, was not told that she could refuse to speak with the detectives, and was not advised that the detectives would leave her hospital room at her request. During the interrogation Monroe was under the influence of morphine, which a medical expert testified would have impaired her comprehension and judgment. In addition, medical professionals assessed Monroe as "[o]verwhelmed and/or unable to participate in decision-making."

Monroe's statements were not voluntary and the detectives should have read Monroe her *Miranda* rights prior to the commencement of the custodial interrogation. We reverse the trial court's order denying Monroe's motion to suppress her hospital statements.

## I. BACKGROUND

On October 16, 2019, Monroe was found unconscious in her home with stab wounds to her thighs and chest, as well as a neck laceration. Her boyfriend was deceased in the bedroom. Monroe arrived at Owosso Memorial Hospital by ambulance at approximately 7:55 p.m. At that time, her

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Glasgow Coma Scale score was assessed as an 8 out of 15.[2] She was administered several medications, including at least 2 doses of fentanyl within the first two hours of her hospitalization. Doctors surgically placed a chest tube to re-inflate her collapsed lung. Due to the nature of her injuries, she was transferred to Sparrow Hospital for further treatment, receiving two units of blood during her transport.

Monroe arrived at Sparrow Hospital's emergency room at approximately 10:17 p.m. on October 16, 2019. Shortly thereafter, she was transferred to the trauma intensive care unit. She underwent surgery to close her wounds a few hours later.

Medical professionals assessed Monroe's mental state multiple times on October 17, 2019. For example, a registered nurse completed a Utilization Review at 8:38 a.m. on October 17, 2019, and noted that Monroe was "a poor historian, distressed and incoherent, stating that she stabbed herself but also that she does not remember what happened." Suicide precautions were implemented and a sitter was placed at her bedside. In addition, the medical staff noted that Monroe "[o]verestimates/[f]orgets [l]imitations" and consistently assessed her as "[o]verwhelmed and/or unable to participate in decision-making." Her medical history was noted to include diagnoses of bipolar 1 disorder and depression.

Sparrow's medical staff further indicated that Monroe was in severe pain, tachycardic, "bedfast" (bedridden), and required "nurse assist" for ambulation. She received five doses of intravenous morphine between 12:20 a.m. and 11:08 a.m. on October 17, 2019. When she received her fifth does at 11:08 a.m., her pain level was assessed as a 7 out of 10. Her pain remained at a 7 out of 10 nearly an hour later at 12:00 p.m. At that time, Monroe's mobility was "[s]lightly limited," her gait and transferring were "weak," and her fall risk was assessed as "high." Her sensory perceptions were also noted to be "slightly limited," her level of consciousness was described as "alert" but "restless," and her breathing was abnormally rapid and shallow with bilateral diminished breath sounds and inspiratory wheezes.

Just two hours after Monroe's fifth dose of morphine, two detectives interrogated her. The interrogation, which continued for two hours, was recorded. The detectives flanked Monroe's hospital bed, with one seated next to her and one seated at the foot of her bed. The recording began with one of the detectives calling out Monroe's name and appearing to rouse her from a state of sleep. During the first 25 minutes of the interrogation, Monroe can be heard groaning, loudly sobbing, coughing, and struggling to breathe. At one point, one of the detectives told Monroe that the monitor reflected that her oxygen level was decreasing. Monroe was encouraged to keep the nasal cannula in place to maintain a steady flow of oxygen. A little over an hour into the interrogation, a nurse entered the room and interrupted the interrogation to administer medication to Monroe to reduce her pain and "take the edge off." Throughout the interrogation, Monroe repeatedly stated that she could not recall any specifics of the events or a timeline. Despite her

_____

[2] The Glasgow Coma Scale (GCS) is scored between 3 and 15, with 3 being the worst and 15 the best. It is composed of 3 parameters: eye opening response, verbal response and motor response. A score of 13 or higher correlates with mild brain injury, a score of 9 to 12 correlates with moderate injury, and a score of 8 or less, such as Monroe's, represents severe brain injury. See https://www.cdc.gov/masstrauma/resources/gcs.pdf

inability to recall the events, the detectives continued to press Monroe for specifics. After nearly two hours of interrogating questions, she responded "I have never been so unsure about anything ever before in my life. I don't know what to say."

It is undisputed that the detectives did not advise Monroe of her *Miranda* rights before the two-hour interrogation. It is further undisputed that the detectives did not tell her that she could refuse to speak with them, or that they would leave if she wanted them to leave.

Ultimately, Monroe was arrested and charged with open murder pursuant to MCL 750.316. Monroe filed a motion to suppress her hospital statements, arguing that they were not voluntary and that she had not been advised of her *Miranda* rights. The trial court held a *Walker*[3] hearing and reviewed the audio recording of the hospital interrogation.

At the hearing, one of the detectives testified that Monroe appeared to be sleeping when they entered her room – she was lying in bed with her eyes closed and opened her eyes only after he called out her name. He admitted that she was hooked up to medical apparatus during the interrogation. He stated that she cried throughout the interrogation and appeared to be gasping for air at times. He did not ask the medical personnel what type of medication Monroe had been administered. He acknowledged that he did not know if she was on any medications that could affect her comprehension. The detective conceded that did not know whether she was able to get out of bed, nor did he ask the medical staff whether she could. He further admitted that the detectives were dressed in plain clothes and their guns and badges were concealed.

The *Walker* hearing included testimony from defendant's expert, Dr. Norman Miller, who is board certified in neurology, psychiatry, addiction psychiatry, and forensic psychiatry. The trial court determined that Dr. Miller was qualified as an expert in general psychiatry. Dr. Miller testified that fentanyl is a sedative that suppresses brain function, sedates behavior, and can cause sleep and confusion. He testified that fentanyl is 100 times more potent than morphine, which is also a sedative that suppresses consciousness and can cause sleep and confusion. He opined that it would have been difficult for Monroe to ambulate due to the medications and her injuries. He stated that a person under the influence of fentanyl and morphine would have difficulty comprehending:

> [T]hey would have difficulty comprehending . . . their surroundings, comprehending people talking to them, comprehending the purpose, comprehending – recalling, being able to make judgment, sensible judgments. Their . . . judgment would be impaired. . . . They really wouldn't be in touch with their surroundings. Their recall would be impaired.

Dr. Miller noted that a person impaired by opioids may recall some things and may not recall others because the impairment "can wax and wane." He also testified that the effects of opioids can accumulate with repetitive doses in a hospital setting. Dr. Miller's opinion was based on his review of the medical records, two interviews of Monroe, and his education and experience.

---

[3] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

He conceded that he did not recall listening to the audio recording of the two-hour interrogation or reviewing the police summary of the interrogation.

The trial court denied Monroe's motion to suppress her hospital statements. At the outset, the trial court concluded that the detectives interrogated Monroe within the meaning of *Miranda*. However, the trial court determined that, for *Miranda* purposes, Monroe was not in custody. The trial court acknowledged, "[f]rom a medical perspective, defendant would have had difficulty leaving her hospital room during questioning." But the trial court dismissed the notion that the hospital environment was more coercive than a police interview room, concluding that the detectives were courteous and respectful.

The trial court rejected Monroe's arguments that her thought-process was impaired by the opioids, concluding that she was articulate and able to recall certain details during the interrogation. Notably, the trial court disagreed with the medical opinions offered by the only expert witness who testified at the hearing, as well as the opinions of the medical professionals who documented that Monroe was a poor historian, distressed, and incoherent. Instead, the trial court substituted its own, non-medical assessment of Monroe's mental state, concluding:

> [D]efendant's medical condition did not meaningfully diminish her judgment. The environment was less coercive than that of a station house, and a reasonable person in her position would have felt free to terminate the interview.

Based on the same factual analysis, the trial court also held that Monroe's statements were voluntary.

## II. STANDARD OF REVIEW

We review a trial court's ultimate decision on a motion to suppress de novo, but we review any factual findings for clear error. *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). A finding is clearly erroneous if, after an examination of the entire record, the reviewing court is left with a definite and firm conviction that the trial court made a mistake. *People v Givans,* 227 Mich App 113, 119; 575 NW2d 84 (1997). Underlying questions of law are reviewed de novo. *People v Daoud,* 462 Mich 621, 629-630; 614 NW2d 152 (2000).

## III. INVOLUNTARY STATEMENTS

Monroe argues that the trial court erred in holding that her statements during the two-hour hospital interrogation were voluntary. We agree.

The United States Constitution and the Michigan Constitution guarantee a right against self-incrimination and afford due process of law. US Const, Ams V and XIV; Const 1963, art 1, § 17. If a statement was not freely and voluntarily made, its use offends due process. *Mincey v Arizona*, 437 US 385, 398; 98 S Ct 2408; 57 L Ed 2d 290 (1978).

Our Supreme Court has articulated factors to guide courts in assessing whether a defendant's statements were voluntary:

In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988) (citations omitted).]

"The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id.*

In *Mincey*, the United States Supreme Court concluded that a defendant's statements obtained from his hospital bed in the intensive care unit were not voluntary and, therefore, inadmissible in the criminal trial. The Court explained the circumstances surrounding the interrogation:

Mincey was brought to the hospital after the shooting and taken immediately to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

At about eight o'clock that evening, [the detective] came to the intensive care unit to interrogate him. Mincey was unable to talk because of the tube in his mouth, and so he responded to [the detective]'s questions by writing answers on pieces of paper provided by the hospital. [The detective] told Mincey he was under arrest for the murder of a police officer, gave him the warnings required by *Miranda v. Arizona*, and began to ask questions about the events that had taken place in Mincey's apartment a few hours earlier. Although Mincey asked repeatedly that the interrogation stop until he could get a lawyer, [the detective] continued to question him until almost midnight. [437 US at 396 (citation omitted).]

The Supreme Court declared that it was "hard to imagine a situation less conducive to the exercise of a rational intellect and a free will than Mincey's." *Id.* at 398 (quotation marks omitted). The Court emphasized the following factors: (1) Mincey was seriously wounded; (2) the interrogation was just a few hours after the injuries were inflicted; (3) he was in the intensive care unit at the time of the interrogation; (4) he described his leg pain as "unbearable;" (5) he was "confused and unable to think clearly about either the events of that afternoon;" (6) he asked for

the interrogation to end; and, (7) "he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus . . . at the complete mercy of [the detective], unable to escape or resist the thrust of [the] interrogation." *Id*. at 398-399 (quotation marks and citations omitted).

Monroe, like Mincey, was seriously wounded and confined to a bed in the hospital's trauma intensive care unit. She was attached to an IV, oxygen and other medical apparatus while flanked by two detectives during a two-hour interrogation. The detectives woke her from a sleep state and immediately started grilling her. During the first ten minutes of questioning, she groaned, sobbed, coughed, and struggled to breathe while the alarms on her medical monitors went off. The detectives informed Monroe that the monitors were signaling that her oxygen level was decreasing. Rather than terminate the interrogation or ask her if she wanted to speak with them, the detectives replaced Monroe's nasal canula and continued to press her for answers. Her pain was significant enough that a dose of morphine just two hours before the interrogation did not decrease her pain level, which remained constant. A little over an hour into the interrogation, a nurse interrupted to give her additional pain medication. Again, the detectives did not terminate the interrogation or ask her if she wanted to speak with them. Monroe had no prior experience with the police and, given her condition, it is unlikely that she would have known that she did not have to speak with the detectives or that they would leave her hospital room if she asked them to leave.[4]

While deference is given to the trial court's credibility assessments and the weight accorded to evidence during a *Walker* hearing,[5] the trial court clearly erred by relying on its own non-medical opinion as opposed to the medical opinions of the only testifying expert witness and the record statements of the hospital medical professionals. Despite the medical expert's testimony that morphine suppresses consciousness and impairs a person's ability to make sensible judgments,

---

[4] We respectfully disagree with the dissent that the facts of this case are similar to *People v Posey,* 334 Mich App 338; 964 NW2d 862 (2020), wherein this Court concluded that a defendant's statements made to the police during a hospital interview following surgery for a gunshot wound were voluntary. The *Posey* Court made the following findings: the defendant's "status as a third-offense habitual offender indicates that he had prior experience with the police;" "[t]he questioning lasted less than 25 minutes, of which, more than six minutes were dedicated to discussing [his] personal information and obtaining a *Miranda* waiver;" the defendant was "alert and articulate;" there was "no sign that he was impaired by any medication during the interview;" "his physical condition was nowhere near as severe as the defendant's condition in *Mincey*;" and there was "no evidence that [his] mental condition was significantly compromised or diminished." Conversely, Monroe had never been involved with the police before the interrogation, her interrogation was nearly five times longer than the one at issue in *Posey*, she exhibited signs of pain throughout the interrogation, she was attached to various medical apparatus throughout the interrogation, medical professionals determined that she was "[o]verwhelmed and/or unable to participate in decision-making," and there was medical expert testimony that the pain medication administered to Monroe suppresses consciousness and impairs a person's ability to make sensible judgments. There is no indication that the defendant in *Posey* presented any medical records or expert testimony to support his arguments.

[5] *People v Ryan*, 295 Mich App 388, 396; 819 NW2d 55 (2012).

the trial court concluded that Monroe's thought process was not impaired by medication. The trial court opined that Monroe knew she could terminate the interview based on the fact that she had declined to speak with the first officer who attempted to get a statement from her.[6] However, the first interview attempt was approximately 15 hours earlier and, more importantly, it occurred before Monroe was administered her first of five doses of morphine over an 11-hour period. The trial court's conclusion is also inconsistent with the medical professionals' determination that Monroe was "[o]verwhelmed and/or unable to participate in decision-making," and unsupported by evidence other than the trial court's erroneous inference that Monroe was in that same condition at the time of the first interview request as she was for the second.

The trial court also disagreed with the registered nurse's assessment that Monroe was a poor historian, distressed and incoherent. The trial court deemed that assessment incorrect because she was able to recall and articulate certain events during the two-hour interrogation. The trial court's non-medical opinion is not only inconsistent with the medical records, it also ignores the expert's testimony that a person impaired by opioids may recall some things and may not recall others because the impairment "can wax and wane."

Considering the totality of the circumstances, Monroe's capacity for self-determination was critically impaired and her hospital statements were not the product of a free and unconstrained choice. *Givans*, 227 Mich App at 121. As such, the trial court clearly erred in finding Monroe's statements were voluntary.

## III. CUSTODIAL INTERROGATION

The fact that Monroe's statements were not voluntary is enough to warrant suppression of the statements that she made during the two-hour hospital interrogation. However, Monroe also argues that the statements should be suppressed because she was "in custody" and entitled to *Miranda* warnings before the questioning began. We agree and find that suppression is warranted on this separate ground as well.

*Miranda* dictates that, prior to any police questioning, a person must be warned of his or her constitutional rights in situations involving a custodial interrogation. *People v Barritt*, 325 Mich App 556, 562; 926 NW2d 811 (2018). Specifically, the person must be informed: "(1) that he has the right to remain silent, (2) that anything he says can and will be used against him in court, (3) that he has a right to the presence of an attorney during any questioning, and (4) that if he cannot afford an attorney one will be appointed for him." *Daoud*, 462 Mich at 625 n 1. Statements made during a custodial interrogation are not admissible unless the defendant "voluntarily,

---

[6] An officer testified that he was instructed to attempt to get a statement from defendant when she was transferred to Sparrow Hospital. He drove the ambulance during the transfer, but had to wait for the Sparrow medical personnel to stabilize her before he could speak with her. The officer conceded that defendant was not physically able to get up and move. Unlike the two detectives who interrogated defendant, the officer asked defendant if she wanted to talk about what happened. The officer terminated the interview when the defendant declined to speak with him.

knowingly, and intelligently" waived his or her constitutional right against self-incrimination. *Miranda*, 384 US at 444.

"Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. The United States Supreme Court has set forth the following constitutional standards to determine whether a person was in "custody" at the time of the interrogation:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauge[d] his freedom of movement, courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. [*Howes v Fields*, 565 US 499, 508-509; 132 S Ct 1181; 182 L Ed 2d 17 (2012) (quotation marks and citations omitted).]

The Supreme Court has concluded that an interview that lasted two hours weighed in favor of a finding that a suspect was in custody. *Yarborough v Alvarado,* 541 US 652, 665; 124 S Ct 2140; 158 L Ed 2d 938 (2004). Under *Yarborough*, the failure to tell a suspect that he or she is free to leave is another factor that can contribute to a finding that a suspect was in custody. *Id.*

Here, Monroe was awakened from a sleep-state shortly after receiving her fifth dose of morphine over an 11-hour period. She was attached to various medical devices and confined to a hospital bed. The detectives flanked her bed, pressing her for answers while she groaned, sobbed, coughed, and struggled to breathe. Despite Monroe's medical condition and emotional state, the detectives did not terminate their questioning or give her an option to not speak with them. Instead, the detectives replaced her nasal canula, watched as the nurse administered additional pain medication, and pressured her to provide them with answers for over two hours. A reasonable person in Monroe's position would perceive that she was the target of the police investigation, that she was not free to terminate the interrogation, and that she was not free to leave. And no evidence supports that Monroe could leave her hospital room even if she wanted to.

Based on the totality of the circumstances, Monroe was in custody at the time that her statements were made and she was entitled to *Miranda* warnings. The trial court erred in failing to suppress her statements.

## IV. CONCLUSION

The trial court clearly erred in finding Monroe's statements were voluntary. Accordingly, the statements Monroe made during the two-hour hospital interrogation must be suppressed.

Additionally, the trial court clearly erred in holding that Monroe was not in custody during the interrogation. The detective's failure to provide *Miranda* warnings before the custodial interrogation supply a second ground for suppressing Monroe's hospital statements.

We reverse the trial court's denial of defendant's motion to suppress and remand for further proceedings.

/s/ Elizabeth L. Gleicher
/s/ Sima G. Patel