*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

NANCY ANN GERWATOWSKI,

Defendant-Appellant.

FOR PUBLICATION
February 04, 2026
11:17 AM

No. 374157
Mackinac Circuit Court
LC No. 22-004294-FC

Before: WALLACE, P.J., and RIORDAN and REDFORD, JJ.

RIORDAN, J.

In 1997, the decomposing remains of an infant were found in a park latrine at Garnet Lake State Forest campground, in a remote area of Mackinac County in Michigan's Upper Peninsula. Because of where the child's body was located, the child was given the name "Baby Garnet." The child appeared to have been birthed after a full-term pregnancy, but no cause of death could be determined, and the investigation of her death became a cold case. Eventually, with the passage of 25 years, advances in genetic technology allowed officials to identify defendant as Baby Garnet's mother, and she is now charged with the open murder and involuntary manslaughter of the infant.

This appeal concerns the admissibility of statements defendant made to two police officers in which she confessed to being Baby Garnet's mother, disposing of the infant's body, and of other conduct during the pregnancy. For the reasons set forth, we affirm the trial court in all respects.

## I. FACTS

Approximately two and a half decades after Baby Garnet's remains were found, two Michigan law enforcement officers made use of recent advances in DNA technology to identify defendant as the probable mother. They, along with two local officers, in possession of a warrant for defendant's DNA, traveled to her home in the state of Wyoming. They asked her to come to the local sheriff's office to discuss an investigation the subject of which they did not identify. Rather than accompany the officers, defendant invited them inside her home. Once inside, the officers, seated with defendant at her kitchen table, told defendant they believed she was Baby Garnet's mother and that they believed defendant knew this to be true. After some discussion, the

officers eventually told defendant that she had a legal right to refuse to come to the local sheriff's office, and they then let her bring her dog into the house and make arrangements for its care. The officers, at defendant's request, gave her a ride to the sheriff's office.

At the sheriff's office, the officers read defendant her *Miranda*[1] rights. Defendant stated that she understood her rights and did not wish to speak. She asked whether there was an attorney for her, and the officers explained that they did not bring one. They explained that she was entitled to consult any attorney she wished, but she was not entitled to a court-appointed attorney until she was arrested. The officers executed the search warrant to obtain a DNA sample from defendant and advised her that she would "be left to watch" while they pieced the story together. They then described that there are two kinds of persons who commit the type of act they were investigating— those who made a bad decision, or those who are monsters. The officers gave their contact information to her and warned that they would be leaving for Michigan the next day and that she should expect to see them again. Defendant then left the sheriff's station and went home.

A few hours later, defendant reached out to speak to the officers and she went back to the sheriff's office. The officers again read defendant's *Miranda* rights to her, told her that she did not need to speak, and invited her to tell them about Baby Garnet. The officers again explained that they did not bring attorneys and, because she was not under arrest, she was not entitled to a court-appointed attorney. Thus, the officers explained, an attorney was her right but also her responsibility. They asked if she would waive her rights and speak to them, and she replied "I guess, yeah."

During that second interview at the sheriff's office, defendant admitted that she was Baby Garnet's mother. She explained that she had been going through a divorce, was unstable, her ex-husband "was drinking a lot and running around," and defendant began to do the same. Defendant stated that when she discovered that she was pregnant, she "didn't know what to do right away, so [she] just didn't do anything." She recalled that she went to a doctor, only one time, and told the doctor that she was thinking about getting an abortion, which seemed to upset the doctor. The doctor told defendant that they did not perform those procedures and referred her to a practitioner in the nearby City of Marquette in Michigan's Upper Peninsula. Defendant also explained that, at the time, her car was "goofed up," and she "wasn't close enough to anybody to ask for help." Defendant told the officers that she wanted to keep the baby, but a divorce attorney told her that being pregnant by someone else might adversely affect her ongoing custody proceedings involving her other children.

She told the officers that she began having labor pains over a weekend while her children were away, and she took a bath in the hope that the pains would go away so that she "could figure out what to do," and "it just happened a lot faster than [she] expected." She gave birth over the course of what felt like "hours and hours," during which the baby became stuck partway during birth, was neither breathing nor crying, and "was all blue." Defendant had to forcibly remove Baby Garnet from her body after Baby Garnet became stuck, and defendant explained that she lost a lot of blood, panicked, did not know what to do, and then "just finally decided that nobody would

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

know." She did not recall whether she had a cellular phone to call anyone at that time. The officers arrested her after these statements.

The trial court denied defendant's motions to suppress the statements she made to the police officers. It made specific findings that defendant was not in custody when she spoke with the officers in her home and that her statements regarding her contemplated abortion and lack of prenatal care were relevant to the case and not unfairly prejudicial.

Defendant now appeals by leave granted.[2]

## II. ADMISSIBILITY OF DEFENDANT'S CONFESSION

Defendant first argues that her confession was obtained in violation of her Fifth Amendment rights and should therefore be excluded. We disagree because defendant was not subject to custodial interrogation, and her eventual statements during the second interview were voluntary.

A trial court's decision whether to suppress evidence is reviewed de novo, but any underlying factual findings are reviewed for clear error. *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). "The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (quotation marks and citation omitted). This Court reviews de novo whether a statement was voluntary, with deference to the trial court's assessment of witness credibility. *People v Ryan*, 295 Mich App 388, 396; 819 NW2d 55 (2012). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (quotation marks and citation omitted).

The United States and Michigan Constitutions protect a defendant's right to due process of law and the privilege against self-incrimination. US Const, Ams V and XIV; Const 1963, art 1, § 17. If a person is in custody, police officers must advise that person of his or her rights consistent with *Miranda* before interrogation. *Clark*, 330 Mich App 415-416. "[I]nterrogation refers to express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Lafey*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361936); slip op at 9 (quotation marks and citation omitted). A person is "in custody" if the objective circumstances would make a reasonable person feel that "he or she was not at liberty to terminate the interrogation and leave." *Barritt*, 325 Mich App at 562 (quotation marks and citation omitted). The relevant circumstances to be considered are

---

[2] *People v Gerwatowski*, unpublished order of the Court of Appeals, entered April 28, 2025 (Docket No. 374157).

(1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the end of the questioning. [*Id*. at 562-563 (ellipses and citations omitted).]

No one circumstance is controlling; rather, whether a person is in custody depends on the totality of the circumstances. *Id*. at 563.

## A. INITIAL ENCOUNTER AT HOME AND FIRST INTERVIEW AT THE POLICE STATION

Review of the record evidence demonstrates that defendant was not in custody during her initial encounter with officers at her home, nor did defendant make any inculpatory statements during that initial encounter. An interview in a person's own home is usually regarded as noncustodial, *People v Coomer*, 245 Mich App 206, 220; 627 NW2d 612 (2001), but the location of the interview is not dispositive, *Barritt*, 325 Mich App 562-569. In this case, defendant's first encounter with officers in her home lasted approximately 21 minutes. The encounter began when Sergeant Demers, Undersheriff Umbarger, and two other local officers knocked on defendant's door unannounced. Defendant, who was home alone, answered the door. After defendant answered the door, the officers asked her to come down to the police station to speak about a matter. Defendant refused the request and, instead, invited the officers into her home.

While inside the home, the officers explained that they knew defendant was Baby Garnet's mother and asked her to agree that she was Baby Garnet's mother. The officers stated that there were two categories of people in her situation, those who had made a bad decision and those who were monsters. Defendant declined to say anything regarding the topic. After additional explanation of the officers' belief that defendant was connected to Baby Garnet through genealogy, the officers again requested that she come to the police station to discuss the matter. Defendant answered by stating that she needed to call her son to come take care of her dog. The officers stated this could occur, but asked that defendant first clarify if she was willing to come to the police station. Thereafter, defendant asked if she had a choice. Rather than directly answer the question, the officers reiterated that they wanted her to tell her story and that "there is a flip side to this coin." When defendant asked them to explain this comment, they refused and stated, "you're not the one in the driver's seat," and again asked if she would come to the police station. Defendant expressed her belief that she did not have a choice, to which the officers responded by saying she was entitled to say no.

Defendant agreed to go to the police station with the officers, but first asked if she could call her son. Apparently, her son did not answer his phone and the officers stated that she could try to call him later. After situating her dog, defendant requested that she change her clothing before they leave. The officers offered to grab clothing for defendant, to which defendant stated that the officers can follow her upstairs. Before leaving the house, the officers searched defendant's purse and heeded defendant's request to place her phone, glasses, and medication into the purse. Thereafter, the officers drove defendant to the police station.

This record does not demonstrate that a person in defendant's position would have felt unable to terminate the interview. Defendant chose the location of the interview. The encounter

took place in defendant's home after she invited the officers inside. Additionally, the encounter was relatively short, lasting approximately 21 minutes. There is no evidence that the officers ever displayed weapons or threatened defendant. Each of these facts weigh against a finding that she was in custody. *Id*. at 563-565. The officers made their intent to discuss Baby Garnet with defendant clear. The officers were accusatory toward her by suggesting that she either made a bad decision or was a monster, which weighs in favor of a finding that defendant was in custody. However, the officers also permitted defendant to begin the discussion inside her home as she requested, assured her that she had a legal right to decline the request to go to the police station, and permitted her to situate her dog and change her clothing before they left. Defendant was not told she was under arrest. There was no record evidence that defendant was placed in handcuffs or otherwise physically retrained during the encounter. These facts also weigh against a finding that defendant was in custody. *Id*. at 570-576.

Defendant argues that she was in custody during the interaction at her home because she was followed around her house and an officer searched her purse. The record does reflect that an officer followed defendant when she went to change her clothing; however, according to defendant's version of events, this occurred after she agreed to go to the police station and after defendant told the officer that he could follow her. Likewise, the officers searched defendant's purse after she had agreed to go to the police station. Defendant also argues that when Sergeant Demers testified at the *Walker*[3] hearing, he admitted that defendant was not free to leave her home because he had not executed the search warrant for defendant's DNA. However, the fact that Detective Demers intended to execute the search warrant does not establish that a reasonable person in defendant's position would not have felt that she could ask the officers to leave. There was no record evidence that defendant was aware the officers had a search warrant for her DNA during the encounter in her home. Detective Demers's subjective belief whether defendant was free to terminate the encounter is not relevant. Focusing on defendant, given this record, a reasonable person in her position would have felt able to terminate the interview in her home. The trial court did not err by concluding defendant was not in custody during the initial encounter at her home.

After defendant agreed to leave with the officers, they drove her to the police station. A police station has been found to be a custodial environment because is a "police-dominated atmosphere." See *id*. at 563. However, the United States Supreme Court also has found that when an accused voluntarily goes to a police station for questioning, is aware that he or she is not under arrest, and terminates the interaction without hinderance from the officers, the totality of the circumstances indicates that he or she was not in custody for *Miranda* purposes. *Oregon v Mathiason*, 429 US 492, 493; 97 S Ct 711; 50 L Ed 2d 714 (1977).

Here, defendant agreed to go to the police station with the officers to discuss Baby Garnet. Before initiating any interrogation, the officers advised defendant of her *Miranda* rights. After asking questions regarding her right to an attorney, defendant invoked her rights and the officers honored the invocation of her rights and immediately ceased questioning her. Thereafter, the officers executed their search warrant for defendant's DNA, and returned defendant to her home

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331, 338; 132 NW2d 87 (1965).

without defendant saying anything incriminating. The totality of these circumstances demonstrate that defendant was not in custody during the first interview at the police station. The trial court also did not err by finding that defendant was not in custody during the first police station interview.

## B. SECOND INTERVIEW AND CONFESSION

After defendant returned to her home, defendant decided to reinitiate contact with the officers several hours later, and contacted the sheriff's office and asked to speak to the officers.

Police officers may resume an interrogation of a suspect who initiates further conversation. *Clark*, 330 Mich App at 416. Because defendant reinitiated contact, the question is "whether, under the totality of the circumstances, [she] knowingly and intelligently waived [her] rights to counsel and to remain silent." *Id*. at 418. The relinquishment must have been "the product of a free and deliberate choice" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *People v Tanner*, 496 Mich 199, 209; 853 NW2d 653 (2014) (quotation marks and citation omitted). Whether a waiver is voluntary is distinct from whether a waiver is knowing and intelligent. *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005).

The record evidence demonstrates that several hours after the police officers dropped defendant off at home, defendant made the decision from her own home to reinitiate contact with the police officers voluntarily. Before calling the police officers, defendant spoke with her son and bade him a tearful farewell. She brought her contact lenses and Bible with her to the police station, which strongly suggested that defendant did not expect to return home. Defendant's conduct met the threshold for having "a very basic understanding" of the ramifications and consequences of waiving her rights. *People v Daoud*, 462 Mich 621, 642; 614 NW2d 152 (2000).

Defendant now argues that her waiver was not knowing because the officers critically misinformed her of the extent of her Fifth Amendment rights. While we agree that the officers erred in this respect, we disagree that their error invalidated defendant's waiver.

As noted, the officers told defendant that she had no right to appointed counsel until she was arrested. That assertion is true of her right to counsel under the Sixth Amendment, which guarantees the right to assistance of counsel and only attaches when a person has been formally or effectively charged with a crime. *People v Wade*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369106); slip op at 7-8. In addition, the officers correctly noted, they were not required to have an attorney on call. *People v Mitchell*, 493 Mich 883 (2012). However, while these individual assertions were accurate, when considered in their totality, the officers' statements were inaccurate because they conflicted with defendant's rights under the Fifth Amendment, which guarantees protection against compelled self-incrimination and which attaches before and during custodial interrogation. *People v Mathews*, 324 Mich App 416, 421, 438-440 & 439 n 8; 922 NW2d 371 (2018). That right includes "the right to *appointed counsel before questioning*, if he cannot afford counsel." *People v Hoffman*, 205 Mich App 1, 6; 518 NW2d 817 (1994) (emphasis

added).[4] Therefore, by telling defendant that she was not entitled to appointed counsel for purposes of questioning, the officers gave her an erroneously limited explanation of the extent of her Fifth Amendment right to counsel. Again, as this Court has previously held, the advice regarding counsel must convey "the immediacy of the right in the sense that it exists both before and during interrogation." *Mathews* 324 Mich App at 435 (quotation marks and citation omitted).

Despite this, defendant was not in custody during her second visit to the sheriff's office. Defendant affirmatively reached out to the police, came to the station willingly, and was told that she was free to leave, all of which weigh against a finding that she was in custody. *Barritt*, 325 Mich App at 563-565. The second interview was not marked by any officer accusations. Instead, the officers merely invited defendant to say what she wanted to say, however much or little that might be. This fact also weighs against a finding that she was in custody. Cf. *id*. at 565-569, 571-572. Most importantly, the officers already had honored defendant's first invocation of her right not to speak with them and had transported her home without issue. Once again considering all of the factors under *Barritt*, and considering the totality of the circumstances that existed during defendant's second visit to the sheriff's office, we find that a reasonable person would have believed that she could refuse to speak to the police and that the officers would honor her request to leave, just as they had done earlier that same day. Put another way, a reasonable person in defendant's situation, having appeared at the police station for the first interview and then told the officers that she would not speak with them, resulting in her being permitted to leave the station, would likewise believe she could refuse to speak to those officers and leave the station after voluntarily appearing a second time. Therefore, because defendant was not in custody during her second time at the station, the officers did not need to provide defendant with *Miranda* warnings before her confession.

In summary, defendant was not subject to custodial interrogation during the initial encounter in her home or during the two interviews at the police station. The trial court correctly declined to exclude defendant's confession in its entirety.[5]

### III. EVIDENCE OF CERTAIN CONDUCT DURING DEFENDANT'S PREGNANCY

Defendant also argues that her statements concerning consideration of abortion and lack of prenatal care during pregnancy are irrelevant and prejudicial, and should be suppressed under

---

[4] As the Court stated in *Miranda*, 384 US at 469, "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process."

[5] We note, even were we to conclude that defendant was in custody during her encounter with law enforcement at her home and the subsequent first meeting at the police station, we still would conclude that defendant's statements at the police station the second time, when she returned to the station of her own volition and provided her confession, was voluntarily given and deny suppression.

-7-

MRE 401 or 403, or both.  We disagree because those statements are relevant and not unfairly prejudicial.

"The decision whether to admit evidence is within the trial court's discretion and will not be disturbed absent an abuse of that discretion."  *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).  "An abuse of discretion occurs when the circuit court chooses an outcome that falls outside the range of principled outcomes."  *People v Jones*, 497 Mich 155, 161; 860 NW2d 112 (2014).  Preliminary questions of law regarding the admissibility of evidence are reviewed de novo.  *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010).

A.  MRE 401

MRE 401 provides as follows:

> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action.

"Relevant evidence is admissible" unless otherwise barred, while "[i]rrelevant evidence is not admissible."  MRE 402.

To determine whether evidence is relevant, courts must apply a two-part test:

> First, we must determine the "materiality" of the evidence.  In other words, we must determine whether the evidence was of consequence to the determination of the action.  Second, we must determine the "probative force" of the evidence, or rather, whether the evidence makes a fact of consequence more or less probable than it would be without the evidence.  [*People v Brooks*, 453 Mich 511, 517-518; 557 NW2d 106 (1996) (some quotation marks and citation omitted).]

With regard to materiality, "the proffered evidence [must] be related to any fact that is of consequence to the action."  *Id*. at 518 (quotation marks and citation omitted).  "However, materiality does not mean that the evidence must be directed at an element of a crime or an applicable defense."  *Id*. (quotation marks and citation omitted).  "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case.  If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial."  *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998) (quotation marks and citation omitted).

With regard to probative force, that term concerns "the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *People v Mills*, 450 Mich 61, 68; 537 NW2d 909 (1995) (quotation marks and citation omitted).  The evidence "need not prove conclusively the proposition for which it is offered.  It need not ever make that proposition appear more probable than not."  *Brooks*, 453 Mich at 519 (quotation marks and citation omitted).  "It is enough if the item could

-8-

reasonably show that a fact is slightly more probable than it would appear without that evidence." *Id.* (quotation marks and citation omitted). "Thus, the common objection that the inference for which the fact is offered 'does not necessarily follow' is untenable." *Id.* (some quotation marks and citation omitted). Simply put, evidence with probative force "need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, but it must in some degree advance the inquiry." *Thompson v Chicago*, 472 F3d 444, 453 (CA 7, 2006) (quotation marks and citations omitted).

Here, as to materiality, the prosecution asserts that evidence that defendant considered an abortion and did not obtain prenatal care during her pregnancy was germane to establish motive, which is always a material issue in a murder case. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008) ("Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant."). See also 1 *McCormick on Evidence* § 185.1 (9th ed.) ("What is 'in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings and the substantive law."). We agree with the prosecution. Because the prosecution has the burden of proving that defendant was responsible for the death of Baby Garnet with a requisite level of intent, such as premeditation, see MCL 750.316(1)(a), the prosecution argues evidence that defendant did not want Baby Garnet to be born alive is material to the issues in this case. In other words, because motive necessarily is "material" in a murder case, see *Unger*, 278 Mich App at 223, and because the prosecution has cited motive as a reason for relevance, those two facts alone show the evidence in dispute can be "material" for the purposes of a relevancy analysis.[6]

Further, and more importantly, evidence that defendant considered an abortion and did not obtain prenatal care during her pregnancy has probative force. In other words, the evidence makes defendant's motive to murder Baby Garnet more probable than it would be without the evidence. See *Brooks*, 453 Mich at 517-518. Defendant told officers that she had "gone to see an attorney for a divorce and . . . he told me the things that could affect my divorce and if my kids would be able to stay with me or not, and he said if I was pregnant by somebody else it would have a . . . varying on if I could raise my kids[.]" In other words, defendant was told that having a child by another man during her custody dispute could have an adverse effect on whether she would receive custody of her current children. This constituted her motive to allegedly commit murder. And, evidence that defendant considered an abortion and did not obtain prenatal care makes that motive more probable. See *Mills*, 450 Mich at 68. That is, evidence that defendant considered an abortion and did not obtain prenatal care despite telling officers that she "really wanted to keep it" shows

---

[6] On appeal, defendant seemingly reasons that the evidence in dispute is not "material" because her "abortion contemplation and other healthcare decisions while carrying her fetus simply cannot demonstrate a fact 'of consequence,' namely her state of mind during her precipitous labor and delivery months later . . . ." The materiality inquiry concerns "the relation between the propositions for which the evidence is offered and the issues in the case." *Crawford*, 458 Mich at 389 (quotation marks and citation omitted). See also 1 *McCormick on Evidence* § 185.1 (9th ed.) ("[Materiality] looks to the relation between the proposition that the evidence is offered to prove and the issues in the case."). Here, because the prosecution is offering the evidence in dispute for motive, which unquestionably is a material issue in a murder case, the materiality inquiry is satisfied.

that defendant deliberately and seriously considered an attorney's advice that having a child by another man during her custody dispute could have an adverse effect on the ultimate custody ruling.

Stated otherwise, if defendant had *not* considered an abortion and *did* obtain prenatal care, those facts would tend to make it less likely that she was motivated to murder Baby Garnet, as those facts would tend to show that she did want Baby Garnet alive despite the attorney's advice. We discern no principled reason why the converse is not true as well. That is, if hypothetical evidence that defendant had not considered an abortion and did obtain prenatal care would be relevant to diminish motive, the actual evidence to the contrary is relevant to show strengthened motive. Conversely, the fact that defendant did not abort the baby and did, at one point, seek the care of a doctor, is material evidence in her favor that she did not intend to terminate her pregnancy or murder her child.

Accordingly, the evidence in dispute concerning consideration of abortion and lack of prenatal care is both material and has probative force, and therefore satisfies the MRE 401 threshold.

## B. MRE 403

MRE 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *Mills*, 450 Mich at 75.

Our Supreme Court has recently explained that, for the purposes of MRE 403, "abortion evidence, while perhaps incendiary to some, is not so inherently prejudicial in today's society as to render it inadmissible." *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018). See also *id.*, quoting *State v Stanton*, 319 NC 180, 186; 353 SE2d 385 (1987) (" 'The mere fact that an abortion took place is not so inflammatory as to render it inadmissible.' "). We follow that principle here and conclude that evidence that defendant considered having an abortion during her pregnancy is not so inherently prejudicial as to require its exclusion under MRE 403.[7] Indeed, the abortion evidence in this case is less prejudicial than in *Sharpe*, as the woman in *Sharpe* actually had an abortion, see *Sharpe*, 502 Mich at 332, whereas defendant here only discussed it with a

---

[7] This is particularly true in light of the fact that, in 2022, a substantial majority of Michigan voters subsequently approved Prop. No. 22-3, an amendment to the state constitution providing that "[e]very individual has a fundamental right to reproductive freedom, which entails the right to make and effectuate decisions about all matters relating to pregnancy, including but not limited to prenatal care, childbirth, postpartum care, contraception, sterilization, [and] abortion care . . . ." Const 1963, art 1, § 28(1).

doctor. And, as explained earlier, the abortion evidence is probative of defendant's motive. Thus, given its probative value, that evidence in this case is not so prejudicial as to require its exclusion under MRE 403. In this case, like the abortion evidence in *Sharpe*, "[a]lthough there may be some danger of juror sympathy for a young woman who has gone through pregnancy and abortion or, alternatively, a danger of juror revulsion for a young woman choosing abortion, the evidence here is both highly probative and concise." *Sharpe*, 502 Mich at 333-334.

Essentially the same reasoning holds true with respect to evidence that defendant did not obtain prenatal care. As defendant herself acknowledges on appeal, "millions of Americans do not receive prenatal care for a myriad of reasons, from a lack of health insurance to an inability to secure children for existing children." See also *Akers v State*, 490 Md 1, 48; 331 A3d 853 (2025) ("[T]he unfortunate reality is that forgoing obstetrical care is not uncommon. . . . Persons of color, persons with low-income, and persons living in rural areas are more likely to lack access to obstetrical care.").[8] Given these facts, we cannot identify any significant prejudice that would occur to defendant by allowing the prosecution to present evidence that she did not obtain prenatal care. Simply put, defendant will be free to argue at trial, as she implies on appeal, that her lack of prenatal care is innocuous and not inculpatory in any respect. Thus, evidence that defendant did not obtain prenatal care is admissible under MRE 403.

To summarize, admission of evidence that defendant contemplated having an abortion and did not obtain prenatal care during her pregnancy does not violate MRE 403. Such issues are sufficiently familiar in today's society that discussion of them at trial is not unfairly prejudicial to defendant. As always, voir dire remains available to provide an unbiased jury and, presumably, the trial court will instruct the jurors on the proper use of the evidence in dispute. "[J]urors are presumed to follow their instructions . . . ." *Unger*, 278 Mich App at 235.

## IV. CONCLUSION

---

[8] In *Akers*, an infant-death case which defendant urges this Court to follow, the Maryland Supreme Court held that "the evidence that Ms. Akers contemplated terminating her pregnancy by conducting internet searches between six and nearly eight months prior to delivery was irrelevant, and therefore inadmissible" because "[t]he termination searches were not probative of motive or intent to kill or harm a child." *Akers*, 490 Md at 49. The Court also held that "evidence of Ms. Akers' bare decision to forgo prenatal care was not probative of motive or intent to kill or harm a live child." *Id*. at 50.

While we have some doubts about the reasoning of *Akers* because, for example, the Court seemingly conflated or confused intent with motive at certain points, see, e.g., *id*. at 40, we need not expressly decline to follow that case because it is distinguishable. In *Akers*, the prosecution argued that the evidence in dispute was directly relevant to establish motive or intent, and the Court rejected that argument. See *id*. at 49-50. Here, in contrast, as we have explained, the evidence in dispute is not necessarily directly relevant to establish motive but, rather, is relevant to show that the motive at issue—the defendant's then-pending custody dispute—was itself an indication of defendant's motivation for her alleged acts.

The trial court did not err or otherwise abuse its discretion by ruling that the challenged statements made by defendant to police officers are admissible. For the reasons explained herein, neither the Fifth Amendment nor *Miranda* requires exclusion of any of these challenged statements. Nor does MRE 401 or 403 require exclusion of evidence that defendant contemplated having an abortion and did not obtain prenatal care during her pregnancy. Therefore, we affirm the trial court.

/s/ Michael J. Riordan
/s/ James Robert Redford